[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAR 07, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-11098

_____

D. C. Docket No. 05-20954-CV-FAM

STEVEN M. BIRCOLL,

Plaintiff-Appellant,

versus

MIAMI-DADE COUNTY,
a political subdivision of the State of Florida,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(March 7, 2007)**

Before TJOFLAT, HULL and BOWMAN,* Circuit Judges.

_____

*Honorable Pasco M. Bowman II, United States Circuit Judge for the Eighth Circuit,
sitting by designation.

HULL, Circuit Judge:

This case arises out of Plaintiff-Appellant Steven M. Bircoll's DUI arrest. Bircoll, who is deaf, sued Defendant-Appellee Miami-Dade County, Florida ("Miami-Dade"), alleging that its law enforcement officers violated Title II of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act by discriminating against him because of his disability. Specifically, Bircoll claims that the officers failed to reasonably modify their procedures in order to ensure effective communication with Bircoll. This case presents an issue of first impression in this circuit as to the applicability of the ADA and the Rehabilitation Act to police conduct during arrests.

## I. FACTUAL BACKGROUND

We first discuss Bircoll's disability and the events during his arrest.[1]

### A. Bircoll's Disability

Bircoll is a profoundly deaf individual with no hearing in his left ear and ten percent hearing in his right ear. When wearing his hearing aid, Bircoll has a twenty percent hearing capacity.

Bircoll, who has been deaf for most of his life, was raised in the hearing world. Bircoll graduated from a mainstream high school and attended two years of

---

[1]We recite the facts in the light most favorable to Bircoll. See Vinyard v. Wilson, 311 F.3d 1340, 1343 n.1 (11th Cir. 2002).

community college.  Bircoll reads, writes, and speaks English.  Although Bircoll sometimes relies on other people to speak for him and uses his friends and relatives for help, Bircoll's primary form of communication is lipreading.  Bircoll has been lipreading for over thirty years.  Bircoll does not know or use sign language.

Bircoll is more effective in reading lips if he is facing the speaker with good light and little background noise.  Bircoll has greater success in communicating with speakers who do not have facial hair, make few facial expressions, and keep their hands away from their faces.  When reading lips, Bircoll usually understands about fifty percent of what is said.  Bircoll speaks with a speech impediment.

As for telephone communication, Bircoll usually communicates with an amplified telephone (one that is louder than a normal phone) and a teletypewriter, a telecommunication device for the deaf ("TDD phone").  Bircoll also has a cell phone that he uses primarily for emergencies, such as calling someone to say he will be late.  Bircoll cannot hear on the cell phone, but he will make the phone call, do the talking, and hang up.[2]

## B.    Traffic Stop

On April 6, 2001, Bircoll went to dinner around 9:00 p.m. with his then-

---

[2]Bircoll as a teenager had a snowmobile accident that injured his legs.  Because of that accident, one leg is shorter than the other.  Bircoll has trouble balancing and standing for prolonged periods of time, cannot run, and sometimes limps when he walks. Bircoll's hearing impairment also affects his balance and causes dizziness.

girlfriend. He was wearing his hearing aid that evening. Bircoll testified that he had less than one drink, a 7-Up with whiskey. Bircoll did not finish his drink because his stomach was bothering him. Around midnight or 1:00 a.m. on April 7th, Bircoll argued with his girlfriend and drove her back to their shared home. Bircoll went into their house, argued with his girlfriend, and then left in his car.

After about an hour of driving south on I-75, Bircoll exited the interstate. He stopped at a gas station to ask for directions back to I-75. As he was leaving the gas station, Bircoll stopped and made a right turn out of a parking lot and arrived at an intersection with a flashing red light where he stopped again. Because trees and bushes were obstructing his view, Bircoll pulled into the intersection to see if there were any oncoming cars. When Bircoll saw that it was clear, he turned left. As Bircoll was trying to determine which ramp to take for I-75, he saw lights flashing in his mirror. Bircoll realized a police officer was pulling him over and stopped.

Sergeant Charles Trask, a police officer with the Miami-Dade County Police Department, was in his patrol car and observed Bircoll's car pull forward into the intersection, reverse because of an oncoming car, and then turn left. Trask pulled Bircoll over at approximately 3:00 a.m. on April 7, 2001. Trask stated that Bircoll failed to stop at both the right turn from the parking lot and at the flashing red light where Bircoll turned left. Trask noted that Bircoll delayed in pulling his vehicle

4

over after Trask activated the overhead lights of his police car.

## C.    Field Sobriety Tests

As Trask approached Bircoll's car, Bircoll rolled down his window. When Trask tried to speak to him, Bircoll informed Trask that he was deaf and had a speech impediment. Either by virtue of his lipreading or hearing aid, or a combination of both, Bircoll was able to respond to Trask during the traffic stop.

Trask asked Bircoll how many drinks he had consumed that night. Bircoll responded that he had not been drinking. When Bircoll spoke, Trask realized that Bircoll had a speech impediment but also noticed that Bircoll responded to sound.

Trask told Bircoll to step out of his car, and Bircoll did. Trask asked Bircoll for his driver's license and registration, which Bircoll provided. Once Bircoll was out of the car, Trask realized that Bircoll smelled of alcohol and had red and watery eyes. Trask offered to communicate by fingerspelling in American Sign Language, but Bircoll responded that he did not understand sign language.[3]

Trask contends that he established face-to-face communication with Bircoll, that he spoke loudly, and that Bircoll spoke back in understandable English. Bircoll, however, states that he had difficulty understanding Trask, that there was

[3]According to his depositions and affidavit, Trask knows the American Sign Language alphabet because he learned to use it fingerspelling with his developmentally delayed son. Bircoll's brief alleges that Trask spoke a made-up sign language, but Bircoll submitted no evidence to support this claim.

5

"little lighting" and it was "almost dark,"[4] that Trask was standing five or six feet away, that Trask's heavy moustache obscured his mouth, and that Trask had to repeat himself "a lot of times."

Bircoll testified that Trask told him if Bircoll would do what Trask told him, Bircoll would be free to go. Trask began to administer field sobriety tests. According to Bircoll, when Trask began instructing him, Bircoll asked if Trask could "call somebody to help me out with this."[5] Trask did not do so, but instructed Bircoll to perform the tests. In his deposition, Bircoll admitted that he understood Trask was asking him to perform sobriety tests, but he did not understand why.

As to the first sobriety test, Trask instructed Bircoll on the Romberg balance exercise. In that test, the individual must keep his feet together, hold his arms by his side, tilt his head back, close his eyes, and count silently for thirty seconds. Trask gave Bircoll verbal instructions and a physical demonstration of the exercise. Trask testified that Bircoll passed this test.

Bircoll admits that he tried the Romberg balance test but contends that he did not complete this test. After he closed his eyes, Trask continued talking.

_____

[4]Trask claims that he left his headlights on, and utility poles with lights were in the area.

[5]In his deposition, Bircoll was asked:
Q: Did you ask for an interpreter at that time?
A: As a matter of fact, I asked him to call somebody to help me out with this.

Bircoll opened his eyes in order to read Trask's lips. When Trask ordered him to close his eyes, Bircoll stated that he needed to be able to see to read Trask's lips. Bircoll testified that he again suggested that they should get "a lawyer or somebody."[6] Bircoll also stated that Trask shined the flashlight in his eyes, that Trask had heavy facial hair, and that he had a hard time understanding Trask. Bircoll told Trask several times that he was deaf and could not hear.

As to the second test, Bircoll performed the one-leg stand exercise, standing on one leg for thirty seconds. Trask gave Bircoll verbal instructions and a physical demonstration of the exercise. Bircoll testified that he had no problems performing this test. Trask contends that Bircoll failed the test because he waved and raised his arms and shuffled his feet to maintain his balance.

As to the third test, Trask gave verbal instructions and demonstrated the walk-and-turn test. In that test, the individual must walk in a straight line, turn, and walk back in the same line. Bircoll understood the instructions and attempted to perform the test, but asked if he could remove his boots. Bircoll had trouble balancing because of his knee injury and his boots. According to Bircoll, after

---

[6]In his deposition, Bircoll described this sobriety test as follows:

He told me close my eyes, put my head back, and then he was saying something, and I opened my eyes trying to listen to him. He said no, no, close your eyes, put your head back. I said, sir, I need to look at your face. I can't hear you when you are talking to me.

We did that a couple of times. He got animated and frustrated, and I knew there was a problem here. And then I told him maybe we should get a lawyer or somebody or at least call somebody because he was getting frustrated.

removing his shoes, he had no trouble walking straight. Trask contends that Bircoll did not maintain his balance and failed the exercise.

As to the fourth test, Bircoll does not remember performing the finger-to-nose test, where the individual must tilt his head back, close his eyes, and touch his index finger to the tip of his nose. Bircoll denied that Trask ever asked him to do this, and testified that he did not complete any test that required him to close his eyes. Trask contends that he verbally instructed and demonstrated the test for Bircoll and that Bircoll failed the finger-to-nose test because he did not keep his eyes closed, missed the tip of his nose, and did not use the correct hand.

Around 3:30 a.m., or thirty minutes after the stop, Trask concluded that Bircoll was too impaired to drive and arrested him for driving under the influence. Trask told Bircoll he was under arrest for DUI, handcuffed Bircoll, and put him in the police car. According to Bircoll, Trask did not inform Bircoll that he was under arrest or read him his rights. After waiting for the tow truck for Bircoll's car, Trask and Bircoll arrived at the police station at 4:10 a.m.

## D. Intoxilyzer Consent Form

Once Bircoll arrived at the police station, another police officer, Officer Everett Townsend, tried to communicate with him and obtain his consent to take an Intoxilyzer test. Bircoll told Townsend that he was deaf. Townsend sat down on Bircoll's left side about a foot away. Townsend had two copies of the Intoxilyzer

8

consent form. Townsend read from one form and handed the other form to Bircoll to read. Bircoll acknowledges that Townsend handed him "a piece of paper" but denies that Townsend asked him to read it.[7]

The consent form advises a DUI arrestee that he will be offered a breath and/or urine test, and that if he refuses to take the test, his driver's license will be suspended, as follows:

> You are under arrest for driving under the influence of alcohol and/or a chemical substance and/or a controlled substance. You will be offered a Breath Test for determining the alcohol content of you[r] breath and/or a Urine Test for detecting the presence of a chemical and/or controlled substance. Should you refuse to take either of the tests, the Department of Highway Safety and Motor Vehicles will suspend your privilege to operate a motor vehicle for a period of twelve (12) months . . . . Your refusal to submit to a breath and/or urine test upon request of a law enforcement official shall be admissible into evidence in any criminal proceeding. You may, at your own expense, have other Chemical or Physical Tests performed to determine the alcohol content of your blood or breath, or to detect the presence of a chemical and/or controlled substance.

Bircoll does not deny that Townsend read aloud the consent form twice. In fact, Bircoll states that he did not read the form himself because Townsend continued talking to Bircoll and Bircoll did not look away from Townsend's face and down at

---

[7]Miami-Dade filed the deposition of Bircoll taken in a malpractice case that Bircoll filed against the attorney who represented him in his DUI case (the "malpractice deposition"). When questioned about the consent form (identified as Exhibit B) in the malpractice deposition, Bircoll admitted that the officer "handed me the piece of paper and I was trying to read it and he was trying to talk to me." When asked when the piece of paper was given to him, Bircoll said it was "[a]fter I was arrested" and "[a]t the police station."

In his deposition in this case, Bircoll stated that "I remember him handing me a piece of paper," but Bircoll denied that he was asked to read it.

the form he was given. However, Bircoll also states that because they were side by side and not facing each other, Bircoll had trouble understanding Townsend. Bircoll testified that Townsend "was talking towards the other way."

As Townsend read aloud the consent form for the first time, Bircoll asked if he could get his wallet, which contained a "Driver's Rights Card." This card states that any consent to a test is not voluntary, as follows:

> In compliance with the requirements of Florida's Implied Consent Law I will consent to submit to tests of my breath, urine, blood or other bodily substances which you may designate, provided the test I am offered is properly done . . . . However, since I maintain that you do not have probable cause to make this request for a chemical test, my consent is given under protest and is no way voluntary.

Townsend stopped reading, photocopied the card, and wrote on the photocopy that Bircoll, upon being shown the consent language on the card, advised that his consent was not voluntary and he was "not consenting to anything." After copying the card, Townsend finished reading the consent form once and then read the form aloud a second time.

Bircoll claims that he requested an interpreter "many times" while he was at the police station. However, Townsend in his affidavit stated that "Bircoll never asked for an interpreter in my presence." Officer James Dooner was also there and stated that Bircoll never asked for an interpreter in his presence.

In addition, Townsend made notes on the two consent forms. On the first

10

form, Townsend wrote "my copy I read from" and recorded that Bircoll said, "I hear you, but I don't understand the law. I understand what you said but I don't understand the law. I['m] not going to consent to anything." The notes on the back say that the consent form was read to Bircoll, that Bircoll was asked if he read English, and that Bircoll was given a consent form to read as well.

On the second form, Townsend wrote, "handed to defendant to read" and noted that he advised Bircoll that he would read aloud so that Bircoll could read his lips. The second form notes that Bircoll stated he would not sign anything.

Bircoll's version of the events differs materially. Bircoll denies that he ever said he understood what the police were saying but did not understand the law. Instead, Bircoll claims he told the officer that he did not understand what the officer was saying. Bircoll also denies saying that he would not consent to anything. Bircoll testified that he never refused to take the Intoxilyzer test and that the police never asked him to take it.

Townsend testified that "[a]lthough it is not usually the practice to give arrestees telephone calls at the Substation," he called Bircoll's girlfriend and informed her of Bircoll's situation. Bircoll's girlfriend stated in her deposition that she found out Bircoll had been arrested for DUI because "[t]he cops called me."

**E.  Jail**

Around 9:15 a.m., Bircoll was transferred from the station to Turner

11

Guilford Knight Correctional Facility ("TGK"). Pursuant to TGK's intake procedures, Bircoll's jail card, which contains information about Bircoll and his arrest, was affixed with an ADA stamp.

After he was fingerprinted and photographed, Bircoll was allowed to make phone calls. Bircoll pointed out to an officer that the phone was a pay phone and told him that he could not hear on a pay phone. According to Bircoll, the officer replied that the pay phone was all that was available and that Bircoll could choose to use it or not. Bircoll then used a regular telephone by dialing his home number three or four times and screaming into it. He hoped that someone would listen to the messages on the answering machine and come get him.

Captain Greg Bennett of the Miami-Dade County Department of Corrections and Rehabilitation explained that under the standard operating procedures governing intake at TGK, a disabled arrestee who is unable to communicate will be provided with appropriate auxiliary aids, such as a TDD phone. Miami-Dade submitted evidence that three TDD phones were delivered to TGK on December 29, 2000. Bircoll testified, however, that he was never offered a TDD phone.

Bircoll was placed in a cell alone and separate from the other inmates. Bircoll was released at 2:16 p.m. the same day.[8] Bircoll's DUI charge was later

[8]In Florida, a person arrested for DUI may not be released from custody:
(a) Until the person is no longer under the influence of alcoholic beverages . . . and affected to the extent that his or her normal faculties are impaired;

<u>nolle prossed</u>.

## II. PROCEDURAL HISTORY

On April 7, 2005, Bircoll filed this lawsuit alleging that: (1) Miami-Dade violated Title II of the ADA, 42 U.S.C. §§ 12131-12134, when it failed to provide him with an interpreter to assist him in communicating with police officers and denied him access to a TDD phone at the jail; and (2) Miami-Dade violated the Rehabilitation Act of 1973, 29 U.S.C. § 794, by discriminating against him when it denied him an interpreter, denied him a TDD phone, and placed him in solitary confinement.[9] Miami-Dade moved for summary judgment on these claims.[10]

As to the ADA claim, the district court noted that this Court has yet to address whether the ADA applies to a DUI arrest. <u>See</u> <u>Bircoll v. Miami-Dade County</u>, 410 F. Supp. 2d 1280, 1283 (S.D. Fla. 2006). The district court adopted the Fourth Circuit's approach in <u>Rosen v. Montgomery County</u>, 121 F.3d 154 (4th Cir. 1997), and concluded that the ADA did not apply to police conduct during

---

(b) Until the person's blood-alcohol level or breath-alcohol level is less than 0.05; or
(c) Until 8 hours have elapsed from the time the person was arrested.
Fla. Stat. § 316.193(9).

[9]Bircoll's complaint also contained a 42 U.S.C. § 1983 claim, but the district court granted Miami-Dade judgment on this count, and it is not involved in this appeal.

[10]Bircoll's complaint initially included the Miami-Dade County Police Department and the Miami-Dade County Department of Corrections and Rehabilitation as defendants. The complaint against the departments was dismissed because they are not legal entities subject to suit. The case proceeded against only Miami-Dade County.

Bircoll's DUI arrest or at the station. Bircoll, 410 F. Supp. 2d at 1283-84. The district court reasoned that the officers at the station "merely communicated the Breath Test consent form to Plaintiff and Plaintiff refused," and that "no 'police investigative activities' ever took place." Id. at 1284-85. As to the Rehabilitation Act claim, the district court determined that a plaintiff who proceeds under a theory of inequal treatment must prove intentional discrimination or bad faith. Id. at 1286. The district court also noted that this Court has not addressed whether intentional discrimination in Rehabilitation Act claims can be proven by "deliberate indifference," but found that in any event Defendant's actions did not rise to the level of intentional discrimination or deliberate indifference. Id.[11]

On appeal, Bircoll argues that the district court erred in concluding that Title II of the ADA did not apply to law enforcement activity during his DUI arrest on the roadside, at the police station, and at the jail. We first review the statutory language of Title II and relevant case law.[12]

_____

[11]The district court also concluded that the police had probable cause to arrest Bircoll for DUI based on his erratic driving, red and watery eyes, and smell of alcohol; that the arrest was not based on Bircoll's disability; and that there was no causal connection between Bircoll's disability and the arrest made during the traffic stop. Bircoll, 410 F. Supp. 2d at 1286.

In his brief on appeal, Bircoll does not advance a wrongful-arrest claim under the ADA but argues only a failure to accommodate his disability. At oral argument, Bircoll's lawyer acknowledged that Trask had probable cause to arrest Bircoll. Thus, we have no occasion to address whether a wrongful-arrest claim would be cognizable under the ADA.

[12]This Court reviews de novo the district court's grant of summary judgment, drawing all facts and inferences in the light most favorable to Bircoll. See Giddens v. Equitable Life Assurance Soc'y of the U.S., 445 F.3d 1286, 1292 n.4 (11th Cir. 2006). Summary judgment is

14

## III. TITLE II OF THE ADA

### A. Statutory Language and Regulations

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA prohibits a "public entity" from discriminating against "a qualified individual with a disability" on account of the individual's disability, as follows:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Title II defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). The Supreme Court has instructed that a disabled prisoner can state a Title II-ADA claim if he is denied participation in an activity provided in state prison by reason of his disability. See Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 211, 118 S. Ct. 1952, 1955 (1998). The words "eligibility" and "participation" in the statutory definition of a

appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Id.

qualified individual with a disability "do not connote voluntariness" and do not require voluntariness on the part of an applicant who seeks a benefit from the state. Id.

Title II of the ADA also provides that "the Attorney General shall promulgate regulations" that implement Title II, Part A. 42 U.S.C. § 12134(a). The Department of Justice ("DOJ") has promulgated regulations implementing Title II's prohibition against discrimination. The DOJ's regulations provide that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).[13]

---

[13]Title I, in its statutory text, notes that discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). Title III, in its statutory text, notes that discrimination includes "a failure to make reasonable modifications in policies, practices, or procedures." 42 U.S.C. § 12182(b)(2)(A)(ii). There is no similar statutory language in Title II.

However, the DOJ regulations for Title II impose the requirement of "reasonable modifications" to procedures to avoid the discrimination prohibited by Title II. Compare 42 U.S.C. §§ 12111, 12112, and 42 U.S.C. § 12182, with 28 C.F.R. pt. 35. There is no claim in this case that the DOJ's Title II regulations go beyond the statutory authority of the ADA. In Olmstead v. L.C. ex rel Zimring, the Supreme Court cited these same DOJ-Title II regulations, stating that "[w]e recite these regulations with the caveat that we do not here determine their validity." 527 U.S. 581, 592 119 S. Ct. 2176, 2183 (1999). The Supreme Court added, "we do not understand petitioners to challenge the regulatory formulations themselves as outside the congressional authorization." Id. Because Miami-Dade has not challenged the validity of the DOJ's regulations for Title II, we likewise interpret and apply the regulations but with the caveat that we do not here determine their validity.

These same DOJ regulations also contain Subpart E, entitled "Communications," which provides that "[a] public entity shall take appropriate steps to ensure that communications with . . . members of the public with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a). These steps include furnishing "appropriate auxiliary aids and services" to afford a disabled individual equal opportunity to participate in an activity of the public entity, as follows:

> A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity.

28 C.F.R. § 35.160(b)(1). The ADA defines "auxiliary aids and services" to include "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments." 42 U.S.C. § 12102(1)(A). The DOJ regulations provide that "auxiliary aids and services" include, among other things, "[q]ualified interpreters" and "telecommunications devices for deaf persons (TDD's)." 28 C.F.R. § 35.104(1). Further, the Appendix to DOJ Regulation § 35.160 states that "[t]he public entity shall honor the [disabled individual's] choice [of auxiliary aid] unless it can demonstrate another effective means of communication exists or that use of the means chosen would not be required under § 35.164." 28 C.F.R. pt. 35, app. A; see also id. §

17

35.160(b)(2) ("In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities.").

The ADA's "reasonable modification" principle, however, does not require a public entity to employ any and all means to make auxiliary aids and services accessible to persons with disabilities, but only to make "reasonable modifications" that would not fundamentally alter the nature of the service or activity of the public entity or impose an undue burden. See Tennessee v. Lane, 541 U.S. 509, 531-32, 124 S. Ct. 1978, 1993-94 (2004) ("Title II does not require States to employ any and all means to make judicial services accessible to persons with disabilities . . . . It requires only 'reasonable modifications' that would not fundamentally alter the nature of the service provided . . . . [or] impose an undue financial or administrative burden.").

## B.    Circuit Law on Arrestees under the ADA

In order to state a Title II claim, a plaintiff generally must prove (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability. See Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir. 2001) (citing 42

18

U.S.C. § 12132).

The parties do not contest that Bircoll is a "qualified individual with a disability" under the first prong, or that Miami-Dade is a "public entity" under the second prong.[14] Rather, the dispute in this case is over whether Bircoll was excluded from participation in, or denied the benefit of, some "services, programs, or activities" of Miami-Dade by reason of his disability, or was "subjected to discrimination" by Miami-Dade by reason of his disability. 42 U.S.C. § 12132.

Relying heavily on the Fourth Circuit's decision in Rosen, in which a deaf person was arrested for DUI, Miami-Dade argues that arrests of deaf persons are not "services, programs, or activities" that fall within the parameters of the ADA. See Rosen, 121 F.3d at 157 ("[C]alling a drunk driving arrest a 'program or activity' of the County, the 'essential eligibility requirements' of which (in this case) are weaving in traffic and being intoxicated, strikes us as a stretch of the statutory language and of the underlying legislative intent."). In Rosen, the Fourth Circuit concluded that even "[i]f we assume, however, that the police were required [under the ADA] to provide auxiliary aids at some point in the process, that point certainly cannot be placed before the arrival at the stationhouse. The

[14]See Yeskey, 524 U.S. at 209-10, 118 S. Ct. at 1954-55 (quoting § 12131(1)(B) and concluding that state prisons "fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government'").

19

police do not have to get an interpreter before they can stop and shackle a fleeing bank robber, and they do not have to do so to stop a suspected drunk driver, conduct a field sobriety test, and make an arrest." Id. at 158.

In reply, Bircoll emphasizes that Rosen was decided before the Supreme Court's Yeskey decision, which concluded that a state prisoner has a cognizable ADA claim if he is denied participation in a required activity in prison by reason of his disability. Additionally, Bircoll relies on three other circuits' decisions indicating that arrestees may state cognizable ADA claims under Title II. See Hainze v. Richards, 207 F.3d 795 (5th Cir. 2000); Gohier v. Enright, 186 F.3d 1216 (10th Cir. 1999); Gorman v. Bartch, 152 F.3d 907 (8th Cir. 1998). However, none of these cases extends the ADA as far as Bircoll claims.

For example, in Hainze, the Fifth Circuit concluded that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents . . . prior to the officer's securing the scene and ensuring that there is no threat to human life." 207 F.3d at 801 (emphasis added). The police officers responded to a request to take a mentally ill individual, Hainze, to a hospital. Id. at 797. When they arrived at the scene, Hainze, with a knife in his hand, began to walk toward one of the officers. Id. In concluding that the ADA did not govern the police officers' actions, the Fifth Circuit pointed out that officers "already face the onerous task of frequently having to instantaneously identify, assess, and react

20

to potentially life-threatening situations." Id. at 801. The Fifth Circuit reasoned that requiring police officers called to the scene of a reported disturbance "to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents." Id.

Nonetheless, the Fifth Circuit indicated that "[o]nce the area was secure and there was no threat to human safety . . . deputies would have been under a duty to reasonably accommodate Hainze's disability in handling and transporting him to a mental health facility." Id. at 802 (emphasis added).[15]

Likewise, the Eighth Circuit concluded that the ADA applies to police transportation of the arrestee from the scene to the police station. See Gorman, 152 F.3d at 912-13. In that case, the Eighth Circuit reasoned that "[t]ransportation of an arrestee to the station house is . . . a service of the police within the meaning of the ADA." Id. at 912. The Eighth Circuit decided that "the 'benefit' [arrestee] Gorman sought . . . was to be handled and transported in a safe and appropriate manner consistent with his disability." Id. at 913 (citing 28 C.F.R. § 35.130(b)(1)). The Eighth Circuit ruled that "Gorman's allegations pass[ed] the threshold required to bring a case under the ADA and the Rehabilitation Act" and reversed

---

[15]Hainze was shot in the chest at the scene and transported by EMS, not the police. The Fifth Circuit's ultimate holding was that Hainze did not state a Title II claim against the police. See Hainze, 207 F.3d at 801.

the judgment for the defendants.[16]  Id.

The Tenth Circuit also recognized the possibility that arrestees may be able to state an ADA claim based on police conduct during an arrest.  Gohier, 186 F.3d at 1220-21.  However, the Tenth Circuit ultimately left the theory of such a claim "an open question" in the circuit because the facts did not show a wrongful arrest based on a disability and the plaintiff made no claim that the police had failed to accommodate his disability during the arrest.  Id. at 1221.[17]

We need not enter the circuits' debate about whether police conduct during an arrest is a program, service, or activity covered by the ADA.  This is because Bircoll, in any event, could still attempt to show an ADA claim under the final clause in the Title II statute: that he was "subjected to discrimination" by a public entity, the police, by reason of his disability.  See 42 U.S.C. § 12132.  Indeed, this Court already has explained that the final clause of § 12132 "protects qualified

_____

[16]The Eighth Circuit remanded the case for development of the factual record, stating: It remains to be determined whether Gorman can prove he was discriminated against or denied a benefit or service because of his disability or whether the defendants can show they made reasonable accommodations of his disability or if further accommodation would have been an undue burden.  29 U.S.C. § 794a(a)(1); 42 U.S.C. § 12133.
Gorman, 152 F.3d at 913.

[17]The Tenth Circuit described two potential theories of ADA-Title II liability: (1) "wrongful-arrest," where the police "wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity"; and (2) "reasonable-accommodation-during-arrest," where the police properly investigate and arrest a person with a disability for a crime unrelated to that disability, but fail "to reasonably accommodate the person's disability in the course of investigation or arrest."  Gohier, 186 F.3d at 1220-21; see supra note 11.

22

individuals with a disability from being 'subjected to discrimination by any such entity,' and is not tied directly to the 'services, programs, or activities' of the public entity." Bledsoe v. Palm Beach County Soil & Water Conservation Dist., 133 F.3d 816, 821-22 (11th Cir. 1998) (quoting 42 U.S.C. § 12132). We said in Bledsoe that this final clause in Title II "'is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context.'" Id. at 822 (quoting Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 44-45 (2d Cir. 1997), overruled on other grounds by Zervos v. Verizon N.Y., Inc., 252 F.3d 163 (2d Cir. 2001)); see also Gohier, 186 F.3d at 1220 (noting that the magistrate judge "ignored the second basis for a Title II claim" and emphasizing the disjunctive language "or be subjected to discrimination" in the final clause of § 12132).

In this case, Bircoll identifies three separate points at which he contends Miami-Dade subjected him to discrimination by reason of his hearing disability: (1) the field sobriety tests on the roadside; (2) the consent warning and Intoxilyzer test at the police station; and (3) his incarceration at TGK. Specifically, Bircoll argues that he was entitled to effective communication with the police throughout his arrest; that he needed auxiliary aids, such as an oral interpreter, for effective communication during these tests; and that the police failed to make reasonable modifications to their procedures to ensure effective communication, thereby subjecting him to discrimination in violation of the ADA.

23

Bircoll claims that if he had been provided with auxiliary aids, he would have understood what the police were asking him to do, would have consented to and passed the Intoxilyzer test, and would not have lost his license or gone to jail. Even if he would have failed the Intoxilyzer test, Bircoll argues that he still was injured because with effective communication he would have consented to the Intoxilyzer test and would not have had his license automatically suspended. We examine each point at which Bircoll claims that he was denied effective communication and discriminated against because of his disability.

## IV. FIELD SOBRIETY TESTS

We turn first to the field sobriety tests. As noted earlier, the Fifth Circuit in Hainze concluded that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents . . . prior to the officer's securing the scene and ensuring that there is no threat to human life." Hainze, 207 F.3d at 801 (emphasis added). In our view, the question is not so much one of the applicability of the ADA because Title II prohibits discrimination by a public entity by reason of Bircoll's disability. The exigent circumstances presented by criminal activity and the already onerous tasks of police on the scene go more to the reasonableness of the requested ADA modification than whether the ADA applies in the first instance.

In other words, the question is whether, given criminal activity and safety

24

concerns, any modification of police procedures is reasonable before the police physically arrest a criminal suspect, secure the scene, and ensure that there is no threat to the public or officer's safety. The reasonable-modification inquiry in Title II-ADA cases is "a highly fact-specific inquiry." See Holbrook v. City of Alpharetta, 112 F.3d 1522, 1527 (11th Cir. 1997) (stating, in a Title I-ADA reasonable accommodation case, that "what is reasonable for each individual employer is a highly fact-specific inquiry that will vary depending on the circumstances and necessities of each employment situation"). We emphasize that terms like reasonable are relative to the particular circumstances of the case and the circumstances of a DUI arrest on the roadside are different from those of an office or school or even a police station. What is reasonable must be decided case-by-case based on numerous factors.

Here, Bircoll claims that he requested an interpreter, which Trask denies. Even assuming Bircoll asked for an oral interpreter,[18] we conclude that waiting for an oral interpreter before taking field sobriety tests is not a reasonable modification of police procedures given the exigent circumstances of a DUI stop on the side of a highway, the on-the-spot judgment required of police, and the serious public safety concerns in DUI criminal activity. In DUI stops, as opposed to minor traffic

_____

[18]Because Bircoll does not know sign language, we assume Bircoll wanted an oral interpreter trained to mouth words so that Bircoll could lip read accurately and to verbalize accurately Bircoll's messages based on his speech and mouth movements.

offenses, the danger to human life is high.  To protect public safety, Trask had to determine quickly, on the roadside at 3:00 a.m., whether Bircoll was sober enough to drive his car further or whether to impound his car and arrest him.  DUI stops involve a situation where time is of the essence.  Forestalling all police activity at a roadside DUI stop until an oral interpreter arrives is not only impractical but also would jeopardize the police's ability to act in time to obtain an accurate measure of the driver's inebriation.  Moreover, field sobriety exercises are short tests that can be physically and visually demonstrated.  DUI stops do not involve lengthy communications and the suspect is not asked to give a written statement.  In sum, field sobriety tests in DUI arrests involve exigencies that necessitate prompt action for the protection of the public and make the provision of an oral interpreter to a driver who speaks English and can read lips per se not reasonable.

We also reject Bircoll's alternative argument that once he told Trask of his deafness, Trask was required to accommodate his deafness by not asking him to perform any field sobriety tests and by immediately arresting him and taking him to the police station for the Intoxilyzer breath test.  Bircoll's proposal, if anything, would force police to arrest deaf DUI suspects before even ascertaining if the suspect could communicate in some other way and understand the field sobriety tests.  This would penalize deaf DUI suspects and not afford them the opportunity to perform the field tests and show their sobriety.

In any event, the actual communication between Trask and Bircoll was not so ineffective that an oral interpreter was necessary to guarantee that Bircoll was on equal footing with hearing individuals. See Kornblau v. Dade County, 86 F.3d 193, 194 (11th Cir. 1996) ("The purpose of the [ADA] is to place those with disabilities on an equal footing, not to give them an unfair advantage."). Bircoll admits that he reads lips and usually understands fifty percent of what is said. In addition to verbal instructions, Trask gave physical demonstrations. During the traffic stop, Bircoll was able to respond to Trask's directions about getting out of the car and providing his driver's license and insurance. While the communication may not have been perfect, Bircoll, by his own admission, understood that he was being asked to perform field sobriety tests. Bircoll also admits he actually tried to perform at least three of those tests. For all of the foregoing reasons, we conclude that Bircoll has failed to state an ADA claim regarding the field sobriety tests during his DUI arrest.

## V. POLICE STATION

Once Bircoll was arrested and arrived at the police station at 4:10 a.m., the exigencies of the situation were greatly reduced. Nonetheless, time remained a factor in obtaining an Intoxilyzer test that accurately measured Bircoll's impairment, or lack thereof, while driving at 3:00 a.m. Townsend read the consent warning to Bircoll. Hearing individuals, even if impaired by alcohol, at least hear

27

the consent warning, and Bircoll is entitled to be placed on equal footing with other arrestees at the police station. Thus, we conclude that at the police station, Townsend was required to take appropriate steps to ensure that his communication with Bircoll was as effective as with other individuals arrested for DUI.

What steps are reasonably necessary to establish effective communication with a hearing-impaired person after a DUI arrest and at a police station will depend on all the factual circumstances of the case, including, but not limited to:

(1) the abilities of, and the usual and preferred method of communication used by, the hearing-impaired arrestee;

(2) the nature of the criminal activity involved and the importance, complexity, context, and duration of the police communication at issue;

(3) the location of the communication and whether it is a one-on-one communication; and

(4) whether the arrestee's requested method of communication imposes an undue burden or fundamental change and whether another effective, but non-burdensome, method of communication exists.

In many circumstances, oral communication plus gestures and visual aids or note writing will achieve effective communication. In other circumstances, an interpreter will be needed. There is no bright-line rule, and the inquiry is highly fact-specific. Thus, we examine all factual circumstances to ascertain whether

28

Townsend achieved effective communication with Bircoll.

As to his abilities and usual communication mode, Bircoll has a twenty percent hearing capacity when using his hearing aid and relies on lipreading to communicate. Bircoll can understand about half of what is said when he is lipreading. He can also read, write, and speak in English.

The police communication at issue–the consent warning–although important, is short and not complex. Morever, even before that night, Bircoll already had some knowledge of what Townsend sought to communicate to him. In a deposition, when questioned about the Intoxilyzer test, Bircoll testified that "I know that if you fail the sobriety test, you have to do the breathalyzer test, yes." Bircoll also already knew that if he refused the Intoxilyzer, he would lose his license for a year.[19]

The communication at issue was one-on-one, with Townsend sitting next to Bircoll on a bench. Townsend read the consent form aloud to Bircoll twice. Townsend spoke to Bircoll in lighted conditions. Moreover, an effective, non-burdensome method of communication existed as to this short implied consent

_____

[19]In the malpractice deposition, Bircoll testified:
Q: You knew when you got a Florida driver's license, if you're stopped and suspected of drinking alcohol, that the officers will give you a breathalyzer test, and if you refuse it, you'll lose your license for a year?
A: I know that but, I don't take the test. I'll lose it.
Q: You were aware of that before you were stopped?
A: Yes.

warning.  Bircoll can read English, and Townsend gave him a copy of the form to read.  Townsend thus accommodated Bircoll by giving him written material.  Bircoll's own failure to read what Townsend provided him does not constitute discrimination.

We recognize that there are factual issues about whether Bircoll requested an interpreter "many times" at the station and whether Townsend was facing, or turning away from, Bircoll.  Nonetheless, Bircoll admits that Townsend read the form aloud twice and gave him a copy.  Even assuming the facts most favorable to Bircoll, we conclude that, under all the circumstances here and especially given Bircoll's admitted prior knowledge, Townsend established effective communication with Bircoll regarding the consent warning and Intoxilyzer test.  Accordingly, Miami-Dade did not violate the ADA at the police station.

## VI.  TGK DETENTION

The corrections officers at TGK recognized Bircoll's hearing disability and affixed an ADA stamp to Bircoll's jail card.  Miami-Dade does not deny that TGK has TDD phones available for disabled arrestees to use and that, under the ADA, it should accommodate Bircoll's hearing loss by making a TDD phone accessible at the jail.  Instead, Miami-Dade asserts that even if Bircoll was denied access to a

30

TDD phone, he cannot show he suffered any injury as a result.[20]

At the police station, Townsend agreed to place a phone call on Bircoll's behalf to his girlfriend. Townsend essentially acted as a relay operator for Bircoll and conveyed to Bircoll's girlfriend that Bircoll had been arrested and needed to be picked up.

Once at TGK, Bircoll used the regular phones to place several calls to his own home–where his girlfriend lived–and leave messages on his answering machine. Bircoll used the regular phones at TGK in the same way he regularly uses his cell phone: by making a phone call and doing the talking in hopes that his message will be received. When Bircoll was discharged, he was picked up by his girlfriend and another friend. His girlfriend successfully received the message that Bircoll had been arrested and picked him up when he was released.

Moreover, Bircoll does not identify whom he would have called from a TDD phone. Bircoll cites no adverse effects associated with his having to rely on the police at the station to make a phone call for him, or his own use of a regular phone at the jail. Because Bircoll has shown no injury, we affirm the grant of summary

---

[20]Bircoll's complaint also alleged a violation of the Rehabilitation Act for being placed in a cell alone and being held for "an inordinate and excessive amount of time." Miami-Dade responded that it provided preliminary protection to Bircoll by placing him in a cell separate from other inmates until it could be determined whether he could be held in an appropriate classification of the inmate general population. Because Bircoll did not argue these claims on appeal, we do not address them. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005); Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989).

judgment for Miami-Dade on Bircoll's TDD claim.[21]

## VII. CONCLUSION

For all of the foregoing reasons, we affirm the district court's order of

January 17, 2006.

**AFFIRMED.**

---

[21]This Court may affirm on any ground supported by the record. See United States v. Mejia, 82 F.3d 1032, 1035 (11th Cir. 1996). For the same reasons we affirm the district court's grant of summary judgment to Miami-Dade on Bircoll's ADA claims, we also affirm the summary judgment granted to Miami-Dade on Bircoll's Rehabilitation Act claims. See Cash v. Smith, 231 F.3d 1301, 1305 & n.2 (11th Cir. 2000) (stating that "[d]iscrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases," and "[c]ases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa").