**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TERESA SHEEHAN,
*Plaintiff-Appellant*,

v.

CITY AND COUNTY OF SAN
FRANCISCO, a municipal corporation;
HEATHER FONG, in her capacity as
Chief of Police for the City and
County of San Francisco; KIMBERLY
REYNOLDS, individually, and in her
capacity as police officer for the City
and County of San Francisco;
KATHERINE HOLDER, individually,
and in her capacity as police officer
for the City and County of San
Francisco,
*Defendants-Appellees*.

No. 11-16401

D.C. No.
3:09-cv-03889-
CRB

OPINION

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted
January 16, 2013—San Francisco, California

Filed February 21, 2014

Before:  John T. Noonan, Susan P. Graber and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher;
Partial Concurrence and Partial Dissent by Judge Graber

## SUMMARY*

### Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment and remanded in an action brought under 42 U.S.C. § 1983, the Americans with Disabilities Act, and state law, alleging that police officers violated plaintiff's rights when they entered her residence without a warrant and shot her after she threatened them with a knife.

The panel held that the officers were justified in entering plaintiff's home *initially* under the emergency aid exception because they had an objectively reasonable basis to believe that plaintiff was in need of emergency medical assistance and they conducted the search or seizure in a reasonable manner up to that point.  The panel also held that the district court properly rejected plaintiff's claims of municipal liability under *Monell v. Department of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978).

---

* This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel held that a jury could find that the officers acted unreasonably by forcing a second entry into plaintiff's residence and provoking a near-fatal confrontation. The panel held that plaintiff presented a triable issue of the unreasonable use of deadly force under a provocation theory. *See Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002).

The panel held that Title II of the Americans with Disabilities Act applies to arrests and on the facts presented in this case, there was a triable issue whether the officers failed to reasonably accommodate plaintiff's disability when they forced their way back into her room without taking her mental illness into account or employing generally accepted police practices for peaceably resolving a confrontation with a person with mental illness. Finally, the panel vacated summary judgment on plaintiff's state law claims and remanded for further proceedings.

Concurring in part and dissenting in part, Judge Graber stated that although she agreed with the remainder of the opinion, she dissented from the majority's decision on the Fourth Amendment excessive force claim with respect to the second entry into plaintiff's apartment.

---

## COUNSEL

John L. Burris and Benjamin Nisenbaum (argued), Law Offices of John L. Burris, Oakland, California, for Plaintiff-Appellant.

Dennis J. Herrera, City Attorney, Joanne Hoeper, Chief Trial Deputy, Blake P. Loebs and Peter J. Keith (argued), Deputy City Attorneys, San Francisco, California, for Defendants-Appellees.

---

## OPINION

FISHER, Circuit Judge:

This case involves a near fatal tragedy in which police officers attempted to help a mentally ill woman who needed medical evaluation and treatment but wound up shooting and nearly killing her instead.  They did so after entering her home without a warrant, causing her to react with violent outrage at the intruders.  Fundamentally at issue is the constitutional balance between a person's right to be left alone in the sanctity of her home and the laudable efforts of the police to render emergency assistance, but in a way that does not turn the intended beneficiary into a victim or a criminal.

Teresa Sheehan, a woman in her mid-50s suffering from a mental illness, lived in a San Francisco group home that accommodated such persons.  Her assigned social worker, Heath Hodge, became concerned about her apparently deteriorating condition and summoned the police for help in transporting her to a mental health facility for a 72-hour involuntary commitment for evaluation and treatment under California Welfare & Institutions Code § 5150.  Hodge deemed Sheehan "gravely disabled," because she was not taking her medication or taking care of herself, and a danger to others, because she had threatened him when he attempted to perform a welfare check on her.  When San Francisco

police officers Kimberly Reynolds and Katherine Holder arrived on the scene, they entered Sheehan's room, without a warrant, to confirm Hodge's assessment and take her into custody. Sheehan reacted violently to the officers' presence, grabbing a knife, threatening to kill the officers, telling the officers that she did not wish to be detained in a mental health facility and forcing the officers to retreat to the hallway, outside Sheehan's closed door, for their safety. The officers called for backup, but rather than waiting for backup or taking other actions to maintain the status quo or de-escalate the situation, the officers drew their weapons and forced their way back into Sheehan's room, presumably to disarm, subdue and arrest her, and to prevent her escape (although there do not appear to have been any means of escape available). Sheehan once again threatened the officers with a knife, causing the officers to shoot Sheehan five or six times. Sheehan, who survived, filed this 42 U.S.C. § 1983 action against the officers and the city, asserting violations of her rights under the Fourth Amendment and the Americans with Disabilities Act, as well as tort and statutory claims under state law. The district court granted summary judgment to the defendants, and Sheehan appealed.

Although a warrantless search or seizure in a person's home is presumptively unreasonable under the Fourth Amendment, our case law recognizes exceptions to the warrant requirement to render emergency assistance or respond to exigent circumstances. We hold that the officers were justified in entering Sheehan's home *initially* under the emergency aid exception because they had an objectively reasonable basis to believe that Sheehan was in need of emergency medical assistance and they conducted the search or seizure in a reasonable manner up to that point. Officers conducting a welfare search, where the objective is rescue,

are expected to err on the side of caution, and under the circumstances of this case the officers reasonably could have believed that Sheehan's situation presented a genuine emergency and that entering as they did was a reasonable means of providing her with assistance.

We nonetheless hold that there are triable issues of fact as to whether the *second entry* violated the Fourth Amendment. If the officers were acting pursuant to the emergency aid exception, then they were required to carry out the search or seizure in a reasonable manner. Similarly, if they were acting pursuant to the exigent circumstances exception, they were required to use reasonable force. Under either standard, a jury could find that the officers acted unreasonably by forcing the second entry and provoking a near-fatal confrontation. We therefore cannot say that the second entry was reasonable as a matter of law.

We further hold that there are triable issues of fact as to whether the officers used excessive force by resorting to deadly force and shooting Sheehan. The shooting was lawful when viewed from the moment of the shooting because at that point Sheehan presented an immediate danger to the officers' safety. Under our case law, however, officers may be held liable for an otherwise lawful defensive use of deadly force when they intentionally or recklessly provoke a violent confrontation by actions that rise to the level of an independent Fourth Amendment violation. *See Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002). Here, Sheehan has presented a triable issue as to whether the officers committed an independent Fourth Amendment violation by unreasonably forcing their way back into her home, and she has also presented evidence from which a reasonable jury could find that the officers acted recklessly in doing so. She

has therefore presented a triable issue of the unreasonable use of deadly force under *Billington*'s provocation theory.

We hold that the district court properly rejected Sheehan's claims of municipal liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). Sheehan's claim that the city is liable on a failure to train theory fails because she concedes that the police department employed appropriate training materials to guide police officers' responses to persons they knew to be suffering from mental illness. That the officers may not have followed those policies does not establish that the city was deliberately indifferent to Sheehan's rights. Sheehan's claim that the city is liable for ratifying the officers' allegedly unconstitutional acts fails because there is no evidence that the city adopted or expressly approved the officers' actions.

Turning to an issue of first impression, we join the majority of circuits that have addressed the issue and hold that Title II of the Americans with Disabilities Act applies to arrests. But we emphasize, as have those other circuits, that the exigencies surrounding police officers' decisions in the field must be taken into account when assessing the reasonableness of the officers' actions. We hold that, on the facts presented here, there is a triable issue whether the officers failed to reasonably accommodate Sheehan's disability when they forced their way back into her room without taking her mental illness into account or employing generally accepted police practices for peaceably resolving a confrontation with a person with mental illness.

Finally, we vacate summary judgment on Sheehan's state law claims and remand for further proceedings.

## BACKGROUND

Teresa Sheehan was a resident of Conrad House, a group home for persons dealing with mental illness located in San Francisco. Residents of the home have private rooms and share common areas, like the kitchen and living room. On August 7, 2008, Heath Hodge, a social worker, attempted to perform a welfare check on Sheehan. When he entered Sheehan's room without her permission, Sheehan told him to get out. She also told him that she had a knife and threatened him.

In light of Sheehan's threat, Hodge cleared the building of other residents. He also completed an application under California Welfare & Institutions Code § 5150 for Sheehan's 72-hour detention for psychiatric evaluation and treatment. He telephoned the police department's nonemergency number and requested police assistance in transporting Sheehan to a mental health facility.

Section 5150 provides a mechanism for mental health professionals or others to initiate a temporary detention of persons who are a danger to themselves or others or "gravely disabled." Section 5150 states in pertinent part:

> When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff, as defined by regulation, of an evaluation facility designated by the county, or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility

> designated by the county and approved by the
> State Department of Health Care Services as
> a facility for 72-hour treatment and
> evaluation.

Cal. Welf. & Inst. Code § 5150(a). The statute defines "gravely disabled" as, inter alia, "[a] condition in which a person, as a result of a mental disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." *Id.* § 5008(h)(1).

The San Francisco Police Department dispatched Officer Katherine Holder and Sergeant Kimberly Reynolds to respond to Hodge's call for assistance. The computer automated dispatch information provided to the officers stated: "Social worker just went inside to check on his patient, subject is known to make violent threats, told reporting party to get out or she'll knife him (no weapon seen) / / Name is Teresa Sheehan / Eurasian, early 50's, wearing striped shirt/pants."

Officer Holder and Sergeant Reynolds met Hodge outside the group home. Hodge showed the officers a card issued by the city identifying him as a person authorized to initiate a 72-hour detention under § 5150. Hodge advised the officers of his reason for the call. He explained that he had gone into Sheehan's room to check on her and that Sheehan had threatened to kill him with a knife. He explained that Sheehan had been off her medication for a matter of months and that she had not been taking care of herself. Hodge also informed the officers that he had cleared the building of other residents and that the only way out of Sheehan's room, other than the main door to the second floor hallway, was a second

floor window that could not be used as a means of egress without a ladder.[1]

Hodge also showed the officers the § 5150 application he had completed before their arrival. The application said:

> Client has been without psychotropic meds times one and a half years. Has been presenting with increased symptoms for several weeks. Client has not been seen by the house counselor times two weeks. Housemates reported that client has been coming and going at odd hours and reportedly said she had stopped eating. It was also reported that client has been wearing the same clothing for several days. Writer conducted outreach to client and she was not responsive. Made no sound behind her closed door. Writer and property management keyed in for wellness check. Upon opening the door, client was found lying in her bed with a book over her face, eyes open and was not responsive. Addressed client several times and she did not move or answer. Client then suddenly got up, threw the covers, and yelled at writer violently, "Get out of here! You don't have a warrant! I have a knife and I'll kill you if I have to!" Client then slammed her door and locked it behind her.

---

[1] Whether Hodge told the officers that no one else was in the building appears to be disputed, but for purposes of evaluating the defendants' motion for summary judgment we view the evidence in the light most favorable to Sheehan, the nonmoving party.

Near the bottom of the application form, Hodge checked two boxes, one to indicate that Sheehan was a danger to others and one to indicate that she was gravely disabled. Hodge did not check the box to indicate that Sheehan was a danger to herself, nor did he give the officers any other reason to believe Sheehan was suicidal or likely to injure herself.

Based on the information furnished by Hodge, the officers decided to contact Sheehan to confirm Hodge's assessment and take Sheehan into custody. Sheehan's room was located at the end of a hallway on the second floor. As the officers faced Sheehan's closed door, there was a closed door to the right and a small alcove, also containing closed doors, to the left.

When they reached Sheehan's door, the officers, accompanied by Hodge, knocked on the door and announced that they were police officers. They used a key that Hodge had given them and opened the door. When the door opened, the officers saw Sheehan lying on her bed with a book on her chest or stomach.

What happened next is mostly, though not entirely, undisputed. In Sergeant Reynolds' telling, Sheehan "raised up, reached over with her left hand very quickly grabbed one of the knives, a larger knife, from the plate and immediately walked in an aggressive threatening manner towards us saying, get out of here. I'm going to kill you. Get out of my room. I don't need your help. Stuff like that, and was repeating it over and over and over again." The "knife was shoved out in front of her, blade pointed towards us. She had her hand on the . . . handle, and as she approached closer to us the knife was always in front of her and there was some moving going on, like a jabbing motion or a stabbing

motion." In Officer Holder's telling, Sheehan "grabbed the knife" and "raised it above her head coming towards Sergeant Reynolds and me saying I'm going to kill you." Hodge confirmed that Sheehan held a knife in her hands and said several times that she would kill the officers if they came near her. Although Sheehan's version of events departs in certain respects from those of the other three witnesses, Sheehan concedes that she held a knife and threatened to kill the officers.[2] Sheehan testified that she told the officers that they didn't have a search warrant and that they needed to subpoena her if they wanted to talk to her. She testified that she told the officers to go away and leave her alone.

This encounter ended when the officers retreated and Sheehan closed the door, leaving Sheehan in her room and the officers and Hodge in the hallway. The officers responded to this situation by calling for backup, drawing their service weapons and directing Hodge to go downstairs to let in additional officers who would be responding to the call for backup. Rather than waiting for backup to arrive, however, the officers decided to forcibly reenter Sheehan's room. As Sergeant Reynolds later explained:

> With the door being closed and us not having the ability to see what she was doing, we had no way of knowing whether or not, one, she

---

[2] Sheehan's appellate briefs acknowledge that her deposition testimony was conflicting and inconsistent. Her briefs state that "there were obvious gaping inconsistencies in her testimony," and that her "testimony also smacks of irrationality that begs the question whether any of it is credible." They say that "the inherent inconsistencies in her testimony cast suspicion over all of it." With respect to some events, in fact, Sheehan's briefs adopt the officers' version of events rather than Sheehan's own.

. . . had an avenue of escape.  Two, there were the possibility of other weapons that she could gain access to.  And so in my opinion, as soon as that door was closed, the threat became more scary for us and more uncertainty about what we were dealing with.

Because Sheehan had "displayed obvious signs of violence and wanting to kill" the officers, Reynolds deemed the entry necessary to ensure officer safety and to prevent Sheehan from escaping (and becoming a threat to others).  Consequently, Reynolds directed Holder to attempt to force the door open.  Reynolds acknowledges that she did not take Sheehan's mental illness into account when she decided to force the second entry.  As Holder used her feet and shoulders to attempt to gain entry, Reynolds stood behind Holder with her pepper spray in one hand and her service weapon in the other.  Holder also had her service weapon out.  The door opened.[3]

What happened next is subject to some dispute.  Under the officers' account, Sheehan emerged from the room brandishing a knife and advanced on the officers.  Reynolds pepper sprayed Sheehan, but without effect.  When Sheehan continued to advance, Holder, and then Reynolds, fired their weapons, hitting Sheehan five or six times.  Sheehan fell to the ground, but continued to swing the knife at the officers

---

[3] The officers used considerable force in gaining entry.  Sergeant Reynolds first tried to get the door open, presumably by kicking and shouldering it, without success.  When she could not force it open, Officer Holder took over.  She unsuccessfully tried to kick it open.  She then resorted to using her shoulder.  After four to six such attempts, the door finally budged.  The officers also had their firearms drawn, itself a significant use of force.

until a backup officer arrived and kicked the knife from Sheehan's hand.  The officers testified that Sheehan was between two and four feet from Holder when Holder first fired – so close that Holder was forced to fire from the hip to prevent Sheehan from cutting her arm.

In Sheehan's telling, she opened the door and showed the officers the knife.  She had the knife upraised in her right hand and took one step toward the officers.  This step placed her on the threshold and it was at that point that she was pepper sprayed by the officers.  Sheehan testified:

> And then I screamed at them.  You're blinding me, you're blinding me.  I can't see. And then I started . . . to fall.  And they right away were shooting me.  I started to come out the door because I was blinded.  I had my knife in my hand. . . .  I was wearing my glasses.  And I started to raise my other arm. And then the shots happened. . . .  And then I fell against the wall in the corridor.  Close to the kitchen door.

After she fell to the floor, an officer kicked the knife from her hand.  Sheehan acknowledges that she continued to hold the knife after she was pepper sprayed and shot.  She also concedes that it was her intent to resist arrest and to use the knife to defend herself against the officers because she did not want to be removed from her home or detained for a 72-hour evaluation.

There is some dispute over whether Sheehan was standing, falling or had reached the ground when Reynolds fired the final shot.  Holder testified that Sheehan had already

reached the ground. Reynolds testified that Sheehan was still standing. Sheehan testified that she was falling against the wall.

Sheehan survived the shooting, and the city prosecuted her for two counts of assault with a deadly weapon, two counts of assaulting a police officer with a deadly weapon and one count of making criminal threats against Hodge. *See* Cal. Penal Code §§ 245(a), (c), 422. The jury hung on the four assault counts and acquitted on the criminal threats count. The city elected not to retry Sheehan.

Sheehan then filed this 42 U.S.C. § 1983 action against the City and County of San Francisco, Police Chief Heather Fong, Sergeant Reynolds and Officer Holder, alleging violations of her Fourth Amendment rights against unreasonable search and seizure, including a warrantless search and use of excessive force. She also alleged violation of her rights under the Americans with Disabilities Act and state law claims for assault and battery, negligence, intentional infliction of emotional distress and violation of California Civil Code § 52.1. The district court granted the defendants' motion for summary judgment, and Sheehan timely appealed.

## STANDARD OF REVIEW

We review the district court's summary judgment rulings, including its rulings on qualified immunity, de novo. *See Maxwell v. Cnty. of San Diego*, 697 F.3d 941, 947 (9th Cir. 2012). "Summary judgment should be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). We view the evidence in

the light most favorable to Sheehan, the nonmoving party, and draw all reasonable inferences in her favor.  *See id.*

Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  To determine whether a government official is entitled to qualified immunity, we conduct a two-part analysis.  Government officials are denied qualified immunity only if (1) the facts that a plaintiff has alleged or proved show a violation of a constitutional right and (2) the right at issue was clearly established at the time of the defendant's alleged misconduct.  *See id.* at 232.  We have discretion in deciding which of the two qualified immunity prongs should be addressed first.  *See id.* at 242.

## DISCUSSION

## I.  FOURTH AMENDMENT

Sheehan contends that the officers violated her Fourth Amendment rights by entering her home without a warrant and using excessive force.  We evaluate the officers' actions in the sequence in which they occurred.

### A.  Initial Entry

We reject Sheehan's contention that the officers violated her Fourth Amendment rights by initially entering her home without a warrant.

**1.**

Searches and seizures inside a home without a warrant are presumptively unreasonable, but that presumption is not irrebuttable, and a warrantless search or seizure is permitted to render emergency aid or address exigent circumstances. *See United States v. Struckman*, 603 F.3d 731, 737-38 (9th Cir. 2010). The emergency aid exception applies when: "(1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need." *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008). To satisfy the exigency exception, the government must prove: (1) that the officer had probable cause to search or arrest; and (2) that exigent circumstances justified the warrantless intrusion. *See Hopkins v. Bonvicino*, 573 F.3d 752, 766–67 (9th Cir. 2009). Exigent circumstances include "those circumstances that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts," *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc), *overruled on other grounds by Estate of Merchant v. Comm'r*, 947 F.2d 1390, 1392–93 (9th Cir. 1991), or when police are in hot pursuit of a suspect, *see United States v. Johnson*, 256 F.3d 895, 907 (9th Cir. 2001) (en banc) (per curiam).

A search or seizure conducted pursuant to either of these exceptions must be carried out in a reasonable manner. Under the emergency aid exception, "the search's scope and

manner [must be] reasonable to meet the need." *Snipe*, 515 F.3d at 952; *see also Brigham City v. Stuart*, 547 U.S. 398, 406–07 (2006) (examining whether "[t]he manner of the officers' entry was also reasonable" under the emergency aid exception). Similarly, under the exigent circumstances exception officers are required to use reasonable force in carrying out the search or seizure. As we said in *Fisher v. City of San Jose*, 558 F.3d 1069 (9th Cir. 2009) (en banc), where we applied the exigent circumstances exception:

> Nothing in today's opinion . . . even hints at disturbing the Fourth Amendment requirement that the force, deadly or not, used in the course of arrest, investigatory stop, or other "seizure" of a person must satisfy the "objective reasonableness" standard. To be clear, we do not suggest that the initial exigency and seizure thereafter condoned unfettered force to resolve the armed standoff, discharged all of Fisher's Fourth Amendment protections, or reduced in any way the probable cause needed to arrest. A court can certainly later examine the officers' actions in connection with a suspect's subsequent criminal trial or a collateral civil rights suit for other alleged Fourth Amendment violations, as the jury did here.

*Id.* at 1084 (citation omitted).

Under the circumstances of this case, we see no meaningful distinction between the emergency aid exception's requirement that a search or seizure be conducted in a reasonable manner and the Fourth Amendment's

requirement that it be carried out without the use of excessive force. Both inquiries stem from the common principle that an otherwise lawful search or seizure – whether justified by a warrant or by an exception to the warrant requirement – "may be invalid if carried out in an *unreasonable* fashion." *Franklin v. Foxworth*, 31 F.3d 873, 875 (9th Cir. 1994). Thus, regardless of whether the officers rely on the emergency aid exception or the exigent circumstances exception, they were required to conduct the search or seizure in a reasonable manner, using reasonable force. We therefore apply the Supreme Court's excessive force standard to both inquiries.[4]

Under that standard, "[d]etermining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). This test of reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The reasonableness of a particular use of force, moreover, "must be judged from the perspective of a

---

[4] It also immaterial whether we characterize the officers' entry as a search or a seizure. Regardless, they were required to use reasonable force. *See Hopkins*, 573 F.3d at 776 ("It is clearly established that the use of excessive force in effecting a seizure violates the Fourth Amendment."); *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004) ("This Circuit has clearly recognized that the use of excessive force during a search makes that search unreasonable under the Fourth Amendment.").

reasonable officer on the scene, rather than with the 20/20 vision of hindsight," making "allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

## 2.

Applying these standards here, we hold that the officers' initial entry into Sheehan's home was lawful under the emergency aid exception.

First, the officers had an objectively reasonable basis for concluding that there was an urgent need to protect Sheehan from serious harm. The officers knew that Sheehan was off her medication, was not taking care of herself and had acted in a threatening manner toward Hodge. They were also aware that, in Hodge's view, she was both "gravely disabled" and in need of temporary, involuntary hospitalization to receive psychological evaluation and treatment. Sheehan points out that she may not have required *immediate* assistance. Hodge had not suggested Sheehan was suicidal and the conditions Hodge described – not eating, not taking medication, not changing clothes – suggested a gradual rather than a sudden deterioration. The officers, however, reasonably took a cautious view of the situation. Hodge, who was a trained social worker and personally familiar with Sheehan's condition, considered the situation dire enough to apply for a § 5150 detention and to call for police assistance in transporting Sheehan to a mental health facility. Hodge had telephoned the police immediately after his encounter with Sheehan, suggesting that the situation was urgent. Sheehan's threatening behavior toward Hodge suggested that

her condition had deteriorated precipitously, again suggesting urgency. Under the circumstances, the officers acted reasonably by treating the situation as a genuine emergency. As we stated in *United States v. Black*, (9th Cir. 2007):

> This is a case where the police would be harshly criticized had they not investigated . . . . Erring on the side of caution is exactly what we expect of conscientious police officers. This is a "welfare search" where rescue is the objective, rather than a search for crime. We should not second-guess the officers['] objectively reasonable decision in such a case.

*Id.* at 1040. *See also Michigan v. Fisher*, 558 U.S. 45, 49 (2009) (per curiam) ("Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception.").

Second, the officers carried out the search or seizure in a reasonable manner up to and including the initial entry. Accompanied by Hodge, the officers knocked and announced that they were police officers. They then used a pass key supplied by Hodge to let themselves in for the purpose of assessing whether Sheehan needed emergency treatment under § 5150. Their weapons were not drawn and they had no reason to believe that their entry would trigger a violent confrontation. The officers therefore used reasonable force under the circumstances.

Accordingly, we hold that the officers' initial entry into Sheehan's home did not violate the Fourth Amendment.[5]

## B. Second Entry

We hold, however, that there are triable issues of fact as to whether the second entry violated the Fourth Amendment.

### 1.

We do not suggest that the officers are liable for acting without a warrant. There are at least two, and possibly three, reasons why the officers were permitted to act without a warrant at the time of the second entry. First, the officers continued to have an objectively reasonable basis for concluding that there was an urgent need to protect Sheehan from serious harm, satisfying the emergency aid exception's first prong. *See Snipe*, 515 F.3d at 952.[6] The emergency that

---

[5] Because we hold that the initial entry falls under the emergency aid exception, we need not decide whether the exigent circumstances exception would also apply. Nor need we address whether the officers' warrantless entry may have been covered by a "special need" exception to the warrant requirement. *See Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987). The First and Third Circuits have held that a special need exception applies when police officers enter a subject's home to take her into custody pursuant to a state law authorizing emergency hospitalization of a person suffering from mental illness. *See Doby v. DeCrescenzo*, 171 F.3d 858, 872 (3d Cir. 1999); *McCabe v. Life-Line Ambulance Serv., Inc.*, 77 F.3d 540, 553 (1st Cir. 1996). The parties have not raised that issue here, however.

[6] The two prongs of the emergency aid exception address distinct Fourth Amendment requirements. The first prong – whether law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm –

existed at the time of the initial entry was no less apparent at the time of the second entry. On the contrary, Sheehan's behavior toward the officers during their initial entry only confirmed that her condition had deteriorated to the point of creating an emergency. Second, because the two entries were part of a single, continuous search or seizure, the officers are not required to separately justify the continuing emergency with respect to the second entry. *See Michigan v. Tyler*, 436 U.S. 499, 511 (1978) ("[W]e find that the morning entries were no more than an actual continuation of the first, and the lack of a warrant thus did not invalidate the resulting seizure of evidence" where the initial entry was justified by exigent circumstances); *Fisher*, 558 F.3d at 1077 ("[W]e conclude that when Fisher was seized at the beginning of the standoff, the officers were not required to periodically reassess whether the exigency persisted throughout the standoff because the standoff was 'no more than an actual continuation' of the initial seizure."); *United States v. Kaplan*, 895 F.2d 618, 623 (9th Cir. 1990); *United States v.*

---

addresses whether the officers proceeded lawfully by acting without a warrant. The second prong – whether the search's scope and manner were reasonable to meet the need – addresses whether, even if a warrant was not required, the officers carried out the search or seizure in an unreasonable manner. A search or seizure comports with the Fourth Amendment only if both prongs are satisfied. *Cf. Fisher*, 558 F.3d at 1080, 1084 (holding that the Fourth Amendment's warrant requirement was satisfied under the exigent circumstances exception but that the officers still could be liable for carrying out the seizure in an unreasonable manner). The first prong is satisfied here, justifying the officers for acting without a warrant. But there are triable issues as to whether the second prong is satisfied.

*Echegoyen*, 799 F.2d 1271, 1280 (9th Cir. 1986).[7]   Third, although the point is debatable, the officers may have been justified in acting without a warrant under the exigent circumstances exception.[8]   That the officers did not have a warrant at the time of the second entry, therefore, did not violate the Fourth Amendment.

## 2.

We are not persuaded, however, that the officers carried out the search or seizure in a reasonable manner at the point of the second entry.   As we have explained, regardless of whether the officers invoke the emergency aid exception or the exigent circumstances exception, they were required to

---

[7] Although the continuous search doctrine applies here, that doctrine speaks only to the warrant requirement, not to the separate requirement that officers carry out a search or seizure in a reasonable manner. *See Fisher*, 558 F.3d at 1084. Thus, although the officers were not required to reassess the existence of an emergency or the need for a warrant periodically, they were required *at all times* to conduct the search or seizure in a reasonable manner.

[8] Because we hold that the absence of a warrant was justified under both the emergency aid exception and the continuous search doctrine, we need not address whether the exigent circumstances exception applies to the second entry.   Whether as a matter of law it would apply is at least questionable.   By the time of the second entry, the officers had probable cause to believe Sheehan had committed a crime by threatening the officers.   Arguably, the officers could have avoided harm to themselves by retreating a safe distance from the door; the knife was not in imminent danger of destruction; there was no "hot pursuit" given that Sheehan "was already inside the [room] when the police officers arrived," *Struckman*, 603 F.3d at 744; and given that Hodge had informed them that the only way out of the room was an inaccessible second story window, and Sheehan had shown no interest in leaving her room, there was no reason to fear Sheehan's escape.

carry out the search or seizure in a reasonable manner, without the use of excessive force. *See Fisher*, 558 F.3d at 1084; *Snipe*, 515 F.3d at 952. Although we have no trouble with the manner in which the officers carried out the search or seizure up to and including the initial entry, we cannot say as a matter of law that the officers continued to carry out the search or seizure in a reasonable manner when they decided to force the second entry, without taking Sheehan's mental illness into account and in an apparent departure from their police officer training.[9]

Sheehan presented an expert report by Lou Reiter, a former deputy chief of the Los Angeles Police Department. We treat Reiter's report as relevant evidence of reasonableness, as we are required to do. Although we have held that the mere fact that an expert disagrees with an officer's actions does not itself compel the conclusion that the officer's actions were unreasonable, *see Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002); *Reynolds v. Cnty. of San Diego*, 84 F.3d 1162, 1170 (9th Cir. 1996), *overruled on other grounds by Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997), a rational jury may rely upon expert evidence in assessing whether an officer's use of force was unreasonable, *see Glenn v. Washington Cnty.*, 673 F.3d 864, 877 (9th Cir. 2011); *Smith v. City of Hemet*, 394 F.3d 689,

---

[9] In examining whether the officers conducted the search or seizure in a reasonable manner at the point of the second entry, we do not focus on the amount of force they employed to force open the door (considerable) and that they did so with their firearms drawn (itself a significant use of force). *See* footnote 3, *supra*. Rather, we focus on their critical decision to enter at all. *See Alexander v. City & Cnty. of San Francisco*, 29 F.3d 1355, 1366–67 (9th Cir. 1994) (holding that there were triable issues as to whether officers used excessive force by storming the house of a mentally ill recluse who had threatened to shoot anybody who entered).

703 (9th Cir. 2005) (en banc); *Reynolds*, 84 F.3d at 1169. Reiter's report is therefore relevant to the excessive force inquiry.

Reiter described general police practices for dealing with persons who are mentally ill or emotionally disturbed, explaining that officers are trained not to unreasonably agitate or excite the person, to contain the person, to respect the person's comfort zone, to use nonthreatening communications and to employ the passage of time to their advantage. He also cited materials used by the San Francisco Police Department to train officers on "appropriate tactical actions" to be used when confronting the mentally ill. These materials, which are germane to the excessive force inquiry because they were designed to protect individuals such as Sheehan from harm, *see Scott v. Henrich*, 39 F.3d 912, 915–16 (9th Cir. 1994), advise officers to request backup, to calm the situation, to communicate, to move slowly, to assume a quiet, nonthreatening manner, to take time to assess the situation and to "give the person time to calm down."

Reiter deemed the officers' second entry into Sheehan's home tactically unreasonable under those policies. In his view, the officers should have "elected to . . . relocate to a safer tactical position, call for special units/equipment, and determine the propriety of seeking a warrant." He opined that there was

> no logical reason that the officers did not pull back from the landing outside Ms. Sheehan's private residence after their first attempt to enter. The location was a tactical disadvantage for the officers. Both officers knew that Ms. Sheehan had refused their entry

and made specific comments regarding the
necessity for a warrant.  They knew that other
resources were en-route to their call for
backup.  Officer Holder's and Sgt. Reynold's
[sic] continued conduct exacerbated the
confrontation, rather than any effort to
[defuse] the agitation.

In view of Reiter's report, the officers' training and the
totality of the circumstances – viewing the facts favorably to
Sheehan as we must – we conclude that a reasonable jury
could find that the officers' decision to force a confrontation
with Sheehan was objectively unreasonable.  *See Alexander
v. City & Cnty. of San Francisco*, 29 F.3d 1355, 1366 (9th
Cir. 1994) (explaining that the operative question is whether
"the force the police used was unreasonable under *all* of the
circumstances").  Although Sheehan needed assistance, the
officers had no reason to believe that a delay in entering her
room would cause her serious harm, especially when weighed
against the high likelihood that a deadly confrontation would
ensue if they forced a confrontation.   Sheehan was not
suicidal, *cf. Fitzgerald v. Santoro*, 707 F.3d 725, 731 (7th Cir.
2013); *West v. Keef*, 479 F.3d 757, 759 (10th Cir. 2007); *Bias
v. Moynihan*, 508 F.3d 1212, 1220 (9th Cir. 2007), or
bleeding to death.  In addition, although the officers may have
been justified in believing that Sheehan had assaulted them
and should be arrested, under her version of the facts there
was no immediate need to subdue her and take her into
custody.  A reasonable jury could find that Sheehan was in a
confined area and not a threat to others – so long as they did
not invade her home.

According to Hodge, the officers knew that there was no
way out of the room other than the door they were guarding

and that there were no other occupants in the building, facts that distinguish this case from those in which officers' more confrontational tactics were held to be reasonable based on the need to protect others. *See, e.g.*, *Reynolds*, 84 F.3d at 1168 ("Reynolds was not in a confined area and there were other people in the vicinity."); *Estate of Bennett v. Wainwright*, 548 F.3d 155, 169 (1st Cir. 2008) ("[A] reasonable officer under the circumstances could have reasonably believed . . . that entering the house without first obtaining a warrant or express consent was necessary to prevent injury to Bennett himself, and to the family members present inside."), *overruled on other grounds by Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009); *Black*, 482 F.3d at 1039 ("The police were justified in their entry because they feared that [a domestic violence victim] could have been inside the apartment, badly injured and in need of medical attention . . . ."); *Ewolski v. City of Brunswick*, 287 F.3d 492, 502 (6th Cir. 2002) (the subject's "dramatic reaction" to police, "combined with the officers' knowledge that he was armed and volatile and that his wife and child were in the house with him, reveals an undisputed body of evidence from which a reasonable officer could have reasonably concluded that there was an immediate threat to [the subject's] wife and son"). Sheehan, with some force, argues that whatever her behavior in resisting unwanted medical assistance and claiming the sanctity of her home, once the officers exited her room and her door was shut the threats to the safety of the officers or others were under control and there was no need to force a confrontation. Of significance, all of the information known to the officers suggested that Sheehan wanted only to be left alone in her home. She had shown no desire to leave the room. Although she had acted in a threatening manner, she had done so only to those who had entered her home without her permission.

The officers also were aware that Sheehan, who they knew was both mentally ill and emotionally disturbed, was not likely to respond rationally to police officers breaking down her door.  A rational person, recognizing that she was outnumbered and facing superior firepower, might have been expected to drop the knife and surrender.  As the officers knew, however, Sheehan was mentally ill and acting irrationally, and, given her initial reaction to the officers, likely to react violently to an escalating show of force.  As we explained in *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001), the tactics to be employed against an

> emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense.  In the former instance, increasing the use of force may, in some circumstances at least, exacerbate the situation; in the latter, a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end.

*Id.* at 1282–83; *see also Glenn*, 673 F.3d at 875 ("Another circumstance relevant to our analysis is whether the officers were or should have been aware that Lukus was emotionally disturbed."); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003) (if "it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness

of the force employed" (quoting *Deorle*, 272 F.3d at 1283)).[10] The officers' decision to force an entry was in effect a decision to cause a violent – and potentially deadly – confrontation with a mentally ill person without a countervailing need. Thus, on this record, we cannot say as a matter of law that the officers conducted the search or seizure in a reasonable manner or used appropriate force by forcing their way back into Sheehan's home.

Of course, a reasonable jury could find that the officers acted reasonably by forcing the entry. Whether Sheehan was contained, the officers had reason to fear Sheehan's escape, the officers knew the building was empty and the officers could have ensured their safety by retreating are all disputed facts that a jury could resolve in the officers' favor. To find the officers liable, moreover, the jury would have to conclude not only that freezing or attempting to de-escalate the situation were reasonable courses of action but also that forcing an entry was *un*reasonable. *See Glenn*, 673 F.3d at 876 (explaining that police officers "need not avail themselves of the least intrusive means of responding to an exigent situation" and that "they need only act within that range of conduct we identify as reasonable" (quoting *Scott*, 39 F.3d at 915) (internal quotation marks omitted)). Viewing the evidence favorably to Sheehan, however, we cannot say that the officers acted reasonably *as a matter of law*.

**3.**

Having determined that a reasonable jury could find a Fourth Amendment violation, we next consider whether the

---

[10] In contrast to *Deorle*, Sheehan was armed. But she was also contained (or so a reasonable jury could find), so *Deorle* remains relevant.

officers are nonetheless entitled to qualified immunity. At this stage of the proceedings, the operative question is whether, again viewing the facts in the light most favorable to Sheehan, the officers violated a clearly established Fourth Amendment right of which all but the plainly incompetent would have been aware. *See Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (per curiam).

As noted, determining whether the force used to effect a particular search or seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *See Graham*, 490 U.S. at 396. Put differently, we "balance the amount of force applied against the need for that force." *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003). Construing the facts favorably to Sheehan, the officers' intrusion on Sheehan's Fourth Amendment rights was profound – the officers forced an entry into her home, apparently without warning and with guns drawn, under conditions that were likely to result in her death. On the other side of the equation, the governmental interest in the intrusion was minimal because she was fully contained, not a flight risk and not a danger to the safety of the officers or others; backup was on the way; and trained negotiators could have been used to defuse the crisis. If there was no pressing need to rush in, and every reason to expect that doing so would result in Sheehan's death or serious injury, then any reasonable officer would have known that this use of force was excessive. *See Deorle*, 272 F.3d at 1281–85 (holding that the use of nonlethal force was excessive when the officers had a clear line of retreat and "could easily have avoided a confrontation, and awaited the arrival of a negotiating team").

Our decision in *Alexander v. City & County of San Francisco*, 29 F.3d 1355 (9th Cir. 1994), is instructive. There, police were present outside the decedent Quade's home to assist in executing an administrative forcible entry warrant permitting local health officials to inspect the home for a sewage leak. *See id.* at 1358. Quade refused to let the inspectors in and threatened to shoot anyone who entered. *See id.* The officers cordoned off the area, attempted to negotiate a peaceful resolution of the standoff for an hour and then forcibly entered the home. *See id.* When the officers entered, Quade pointed and fired a gun at the officers, who returned fire, shooting and killing him. *See id.* The plaintiff (Quade's executor) alleged that the officers used excessive force, challenging not the shooting itself but rather the force the officers used in entering the house. *See id.* at 1366 & n.12. We denied summary judgment to the defendants both on the merits and on their qualified immunity defense. *See id.* at 1366–67. We held that the plaintiff's claim "that it was unreasonable for the officers to storm the house of a man whom they knew to be a mentally ill, elderly, half-blind recluse who had threatened to shoot anybody who entered" stated "a classic Fourth Amendment violation under *Graham*." *Id.* at 1366. We said that, if the jury were to find that the officers stormed the house to carry out the health inspection, "then the jury may also conclude that the force used . . . was excessive in relation to the purpose for which it was used." *Id.* at 1367.

*Alexander* and this case have much in common. In both cases, police officers had a legal right to enter a person's home (to render emergency aid in Sheehan's case and to execute an administrative warrant in *Alexander*). In both cases, the subject was contained and had threatened those who entered. In both, the officers knew they were dealing

with someone who was mentally ill and acting irrationally. And in both, police officers decided to force an entry, knowing it was likely to result in a violent confrontation, absent the need to do so. Indeed, the facts here are in one respect even more troubling than those in *Alexander*. The officers radioed for reinforcements in both cases, but only in *Alexander* did the officers wait for backup to arrive and at least attempt negotiation before storming in.[11]

Although the facts of *Alexander* are not identical to those of this case, *Graham*, *Alexander* and *Deorle* would have placed any reasonable, competent officer on notice that it is unreasonable to forcibly enter the home of an armed, mentally ill subject who had been acting irrationally and had threatened anyone who entered when there was no objective need for immediate entry. We emphasize that at trial the facts may show that Sheehan was not contained, that she presented a flight risk, that officers or others were in danger, or that the officers reasonably but mistakenly believed that their entry was necessary to prevent Sheehan's escape or ensure the safety of themselves or others. The facts, however, are disputed, and it would be premature to hold at this stage of the proceedings that the officers are – as a matter

---

[11] We acknowledge that *Alexander* has been limited by subsequent circuit precedent to the extent it informs our provocation doctrine – the principle discussed in part I.C of this opinion that an officer may be liable for an otherwise reasonable use of deadly force when the officer has intentionally or recklessly provoked the deadly confrontation. *See George v. Morris*, 736 F.3d 829, 839 n.14 (9th Cir. 2013); *Billington*, 292 F.3d at 1188–91. Those cases are inapplicable here, however, where the issue at this point is not whether *the shooting* violated the Fourth Amendment (on a provocation theory) but rather whether the officers' antecedent *forcible entry* did.

of law – entitled to qualified immunity.  *See Glenn*, 673 F.3d at 870 & n.7; *Alexander*, 29 F.3d at 1366–67.**[12]**

## C. Deadly Force

We turn, then, to the officers' use of deadly force.  "[A]n officer's use of deadly force is reasonable if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'"  *Reynolds*, 84 F.3d at 1167 (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)).  "Thus, where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force."  *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (en banc).

Here, the officers' use of deadly force – *viewed from the standpoint of the moment of the shooting* – was reasonable as a matter of law.  Although the parties disagree over the details surrounding the shooting, the material facts are undisputed: Sheehan had threatened to kill the officers, she wielded a knife in an upraised position, she advanced toward the officers, she did not drop the knife after being pepper sprayed (or even after being shot) and the shooting took place while Sheehan was only a few feet from a cornered Officer Holder. Although Sheehan insists that she was blinded and disabled by the pepper spray, she indisputably continued to hold the knife and advance toward the officers, in cramped quarters,

---

**[12]** If Sheehan is able to establish that the second entry violated the Fourth Amendment (and the officers are not entitled to qualified immunity), then she can recover damages proximately caused by the violation.  *See Jackson v. Gates*, 975 F.2d 648, 655 (9th Cir. 1992) ("Under § 1983 Jackson was entitled to sue for all consequential damages resulting from the violation of his Fourth Amendment rights.").

after being sprayed. Thus, even if Sheehan *in fact* was not intending to attack the officers at that point in the confrontation, the officers reasonably believed they were still in danger. At the moment of the shooting, the defensive use of deadly force, although unfortunate, did not violate the Fourth Amendment.

We must also consider whether the shooting was reasonable when the events leading up to the shooting are taken into account. As previously discussed, "where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force." *Billington*, 292 F.3d at 1189 (emphasis added). Here, Sheehan has presented a triable issue as to whether the officers committed an independent Fourth Amendment violation by their forcible second entry into her room, as discussed above. In addition, Sheehan has presented evidence from which a reasonable jury could find that the officers acted recklessly in failing to take Sheehan's mental illness into account and in forcing a deadly confrontation rather than freezing or attempting to de-escalate the situation. We therefore hold that there are triable issues of fact as to whether the shooting was unreasonable on a provocation theory.

Finally, we address Sheehan's claim that Sergeant Reynolds' final shot amounted to excessive force. Assuming, as we must, that Sheehan had already reached the ground when Reynolds fired the final shot, we nonetheless hold that Reynolds is entitled to qualified immunity. Even if Reynolds continued to fire after Sheehan reached the ground, "it is clear from the very brief time that elapsed that [Reynolds] made a split-second judgment in responding to an imminent threat

and fired a fusillade in an emergency situation." *Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007). Reynolds' actions "cannot be found unreasonable because she may have failed to perfectly calibrate the amount of force required to protect herself." *Id.* Even if Sheehan was on the ground, she was certainly not subdued, and she continued to hold a knife and threaten the officers, especially Holder, who was cornered and in close proximity to Sheehan. Sheehan has presented no authority holding that the use of deadly force under similar circumstances was excessive. Thus, Reynolds is entitled to qualified immunity on this basis.

## II. *MONELL* CLAIMS

Sheehan asserted § 1983 claims against the city under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). She raises two theories of municipal liability: (1) failure to train and (2) ratification. We hold that the district court properly granted summary judgment to the city on each of these claims.

### A. Failure to Train

"The 'inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" *Price v. Sery*, 513 F.3d 962, 973 (9th Cir. 2008) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Here, Reynolds acknowledges that she did not take Sheehan's mental illness into account when she ordered the second entry into Sheehan's room. Sheehan, however, has not pointed to anything in the record to suggest that Reynolds' training was responsible for her decision to disregard Sheehan's mental

illness.     On the contrary, Sheehan concedes that the department employed appropriate training materials to guide police officers' responses to persons they knew to be suffering from mental illness.    That Reynolds may have disregarded her training does not show that the city was deliberately indifferent.

## B.  Ratification

Sheehan's ratification theory also fails.    "To show ratification, a plaintiff must prove that the 'authorized policymakers approve a subordinate's decision and the basis for it.'" *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).  "We have found municipal liability on the basis of ratification when the officials involved adopted and expressly approved of the acts of others who caused the constitutional violation."  *Trevino v. Gate*s, 99 F.3d 911, 920 (9th Cir. 1996).

Sheehan contends that the city ratified the officers' conduct by not disciplining them.  Ratification, however, generally requires more than acquiescence.  There is no evidence in the record that policymakers "made a deliberate choice to endorse" the officers' actions. *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992).  The mere failure to discipline Reynolds and Holder does not amount to ratification of their allegedly unconstitutional actions. *See Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1253–54 (9th Cir. 2010) (holding that the failure to discipline employees, without more, was insufficient to establish ratification); *Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989) (refusing to hold that the "failure of a police

department to discipline in a specific instance is an adequate basis for municipal liability under *Monell*").

### III.  AMERICANS WITH DISABILITIES ACT

We next address Sheehan's claim that the city violated her rights under the Americans with Disabilities Act (ADA).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Discrimination includes a failure to reasonably accommodate a person's disability.  As United States Department of Justice regulations state:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7).

We have not previously addressed whether the ADA applies to arrests, *see Thompson v. Davis*, 295 F.3d 890, 897 (9th Cir. 2002), and the question is a matter of some disagreement among other circuits.  The Fifth Circuit has held that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents,

whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000). Other circuits have declined to adopt the Fifth Circuit's approach. In *Bircoll v. Miami-Dade County*, 480 F.3d 1072 (11th Cir. 2007), the Eleventh Circuit held that "the question is not so much one of the applicability of the ADA because Title II prohibits discrimination by a public entity by reason of [a person's] disability. The exigent circumstances presented by criminal activity and the already onerous tasks of police on the scene go more to the reasonableness of the requested ADA modification than whether the ADA applies in the first instance." *Id.* at 1085. Similarly, in *Gohier v. Enright*, 186 F.3d 1216 (10th Cir. 1999), the Tenth Circuit held that "a broad rule categorically excluding arrests from the scope of Title II . . . is not the law." *Id.* at 1221. In *Waller ex rel. Estate of Hunt v. City of Danville*, 556 F.3d 171, 175 (4th Cir. 2009), the Fourth Circuit reserved judgment on the Fifth Circuit's approach and then went on to consider a reasonable accommodation claim involving an arrest. Like the Eleventh Circuit, *Waller* held that "exigency is one circumstance that bears materially on the inquiry into reasonableness under the ADA." *Id. See also Tucker v. Tennessee*, 539 F.3d 526, 534 (6th Cir. 2008) (addressing a Title II reasonable accommodation claim in which the plaintiffs asserted that police officers "discriminated against them in violation of the ADA by failing to provide a qualified sign language interpreter or other such reasonable accommodation(s) during the domestic disturbance call that resulted in their arrest").

We agree with the majority of circuits to have addressed the question that Title II applies to arrests. The ADA applies broadly to police "services, programs, or activities."

42 U.S.C. § 12132.  We have interpreted these terms to encompass "anything a public entity does." *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001)) (internal quotation marks omitted).  The ADA therefore applies to arrests, though we agree with the Eleventh and Fourth Circuits that exigent circumstances inform the reasonableness analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment.  *See Waller*, 556 F.3d at 175 ("Just as the constraints of time figure in what is required of police under the Fourth Amendment, they bear on what is reasonable under the ADA.").

Courts have recognized at least two types of Title II claims applicable to arrests: (1) wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity; and (2) reasonable accommodation, where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees.  *See Waller*, 556 F.3d at 174; *Gohier*, 186 F.3d at 1220-21.

Sheehan raises the second type of claim here.  She asserts that the officers failed to reasonably accommodate her disability by forcing their way back into her room without taking her mental illness into account and without employing tactics that would have been likely to resolve the situation without injury to herself or others.  To state a claim under Title II of the ADA, a plaintiff generally must show: (1) she is an individual with a disability; (2) she is otherwise

qualified to participate in or receive the benefit of a public entity's services, programs or activities; (3) she was either excluded from participation in or denied the benefits of the public entity's services, programs or activities or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits or discrimination was by reason of her disability. *See O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060 (9th Cir. 2007). In a Title II claim grounded in a public entity's alleged failure to provide a reasonable accommodation under 28 C.F.R. § 35.130(b)(7), the plaintiff bears the initial burden of producing evidence of the existence of a reasonable accommodation. *See Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002). A public entity may defeat a reasonable accommodation claim by showing "that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7); *see Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1047 (9th Cir. 1999).

It is undisputed that Sheehan had a disability and that the officers knew it at the time they encountered her. We turn, therefore, to whether the city discriminated against Sheehan by failing to provide a reasonable accommodation during the second entry. Sheehan asserts that the city failed to provide a reasonable accommodation when the officers forced their way back into her room without taking her mental illness into account. She asserts that the officers should have respected her comfort zone, engaged in non-threatening communications and used the passage of time to defuse the situation rather than precipitating a deadly confrontation. We acknowledge that the officers were forced to make split-second decisions. A reasonable jury nevertheless could find that the situation had been defused sufficiently, following the initial retreat from Sheehan's room, to afford the officers an

opportunity to wait for backup and to employ less confrontational tactics, including the accommodations that Sheehan asserts were necessary. For the reasons stated here, and because the reasonableness of an accommodation is ordinarily a question of fact, *see EEOC v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1110 (9th Cir. 2010), we hold that the city is not entitled to judgment as a matter of law on Sheehan's ADA claim.

## IV.  STATE LAW CLAIMS

Sheehan asserts state law claims for negligence, assault and battery, intentional infliction of emotional distress and violation of California Civil Code § 52.1. The district court ruled that the defendants are immune from liability on those claims under California Welfare & Institutions Code § 5278, which provides:  "Individuals authorized under this part to detain a person for 72-hour treatment and evaluation . . . shall not be held either criminally or civilly liable for exercising this authority in accordance with the law."

In *Bias v. Moynihan*, 508 F.3d 1212, 1221 (9th Cir. 2007), we held that a police officer was immune under § 5278 from state law claims for assault and battery, false arrest, illegal imprisonment and intentional infliction of emotional distress where the officer had probable cause to take the plaintiff into custody in accordance with § 5150. The scope of § 5278 immunity, however, is not as all-encompassing as the defendants argue. Section 5278 is part of the Lanterman-Petris-Short Act, which must be construed to protect mentally disordered persons. *See Gonzalez v. Paradise Valley Hosp.*, 3 Cal. Rptr. 3d 903, 907 (Ct. App. 2003). In *Jacobs v. Grossmont Hospital*, 133 Cal. Rptr. 2d 9 (Ct. App. 2003), the California Court of Appeal held that

the immunity of section 5278 extends to claims based on *circumstances that are inherent in an involuntary detention* pursuant to section 5150.  Without the immunity provided by section 5278, an involuntary detention and treatment without consent would arguably constitute kidnapping, false imprisonment, or battery.  Section 5278 was intended to provide immunity for claims based on *conduct that is expressly authorized by the LPS Act but would otherwise constitute a civil or criminal wrong*. . . . [A] plaintiff who is properly detained in accordance with the LPS Act may not assert any civil claim based solely on the fact that he was detained, evaluated, or treated without his consent [but] section 5278 [does not] confer blanket immunity for any act or omission that might occur during a 72-hour hold, no matter how negligent, wrongful, or even criminal.

*Id.* at 15 (emphasis added).

Thus, § 5278 immunizes the police officers from the *decision to detain* Sheehan under § 5150.  Section 5278 also immunizes the officers from liability for the *fact of Sheehan's detention*.  Finally, § 5278 immunizes the officers based on circumstances *inherent* in her involuntary detention.  *See id.* at 16.  Section 5278, however, does not immunize the officers if they were negligent in executing the detention.  Any injury Sheehan suffered from the officers' failure to exercise ordinary care in taking Sheehan into custody would not be an "inherent attribute[]" of her detention and therefore would not

be subject to § 5278 immunity.  *Id.*  *Bias* does not hold to the contrary.

The district court therefore erred by granting summary judgment to the defendants under § 5278.  The defendants argue that they are entitled to immunity under several other statutes.  *See* Cal. Gov't Code § 821.6; Cal. Penal Code §§ 196, 836.5, 835a, 847(b).  Although we may affirm on any ground supported by the record, we decline to address the defendants' alternative arguments because they have not been passed upon by the district court.  We therefore vacate the dismissal of these claims and remand to the district court.

## CONCLUSION

The district court properly granted summary judgment to the defendants on Sheehan's warrantless entry Fourth Amendment claims and on her *Monell* claims against the city. The district court erred by granting summary judgment on Sheehan's Fourth Amendment claims challenging the manner of the second entry and the use of deadly force and on her ADA and state law claims.  We therefore affirm the judgment in part, vacate it in part and remand for further proceedings. Each party shall bear its own costs on appeal.

**AFFIRMED IN PART, VACATED IN PART AND REMANDED.**

GRABER, Circuit Judge, concurring in part and dissenting in part:

Although I agree with the remainder of the opinion, I respectfully dissent from the majority's decision on the Fourth Amendment excessive force claim with respect to the second entry into Plaintiff's apartment. Whether that second entry is viewed as a separate search or, instead, as part of one continuous search, the officers are entitled to qualified immunity even when taking all facts in the summary judgment record in Plaintiff's favor. Accordingly, I would affirm the summary judgment in favor of Defendants on that claim.

## A. *If the Second Entry Is a Separate Search*

The second entry met an exception to the warrant requirement—the emergency aid doctrine or the exigent circumstances doctrine or both. Plaintiff was off her psychotropic medications, was not taking care of herself, and was making violent threats toward other people. Upon the first entry, which the majority agrees was lawful under the Fourth Amendment, Plaintiff had threatened to kill the officers while wielding a knife. Defendants did not know whether Plaintiff could escape from the apartment by another route, such as a window, or whether she had access to additional weapons, such as firearms, in either event creating the immediate possibility of harm to the officers, Plaintiff, and others. Accordingly, as the majority holds, the officers could enter the apartment for the second time without violating the warrant requirement of the Fourth Amendment.

As to the method of effecting the second entry, Defendants determinedly pushed the door open while holding

pepper spray and a service weapon. In light of the danger posed by Plaintiff, who held a knife and had threatened to kill the officers, the officers reasonably could conclude that entering the apartment in that way would not violate the Fourth Amendment's prohibition on the use of excessive force.

The expert's report that faulted the officers for electing to enter Plaintiff's apartment when and as they did does not create an issue of fact on either the timing or the method of the second entry. As we have cautioned, a plaintiff cannot avoid summary judgment merely by producing an expert's report opining that an officer's conduct was imprudent or inappropriate:

> We have since placed important limitations on *Alexander [v. City of San Francisco*, 29 F.3d 1355 (9th Cir. 1994)]. In *Scott v. Henrich*, [39 F.3d 912, 915 (9th Cir. 1994)], we held that even though the officers might have had "less intrusive alternatives available to them," and perhaps under departmental guidelines should have "developed a tactical plan" instead of attempting an immediate seizure, police officers "need not avail themselves of the least intrusive means of responding" and need only act "within that range of conduct we identify as reasonable." We reinforced this point in *Reynolds v. County of San Diego*, [84 F.3d 1162, 1169 (9th Cir. 1996),] which distinguished *Alexander* because "the court must allow for the fact that officers are forced to make split second decisions." We affirmed

summary judgment for the defendant police officers despite experts' reports stating—like the expert report in the case at bar—that the officers should have called and waited for backup, rather than taking immediate action that led to deadly combat. [*Id.* at 1169–70.] We held that, even for summary judgment purposes, "the fact that an expert disagrees with the officer's actions does not render the officer's actions unreasonable." [*Id.* at 1170.] Together, *Scott* and *Reynolds* prevent a plaintiff from avoiding summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless. [*Id.*] Rather, the court must decide as a matter of law "whether a reasonable officer could have believed that his conduct was justified." [*Id.*]

*Billington v. Smith*, 292 F.3d 1177, 1188–89 (9th Cir. 2002) (footnotes omitted).

## B. *If the Second Entry Is Part of a Continuous Search*

The first and second entries may, in the alternative, be considered part of a single, continuous search. Insofar as the exigent circumstances that justified the first entry were ongoing, the second entry was justified under the emergency aid exception.

When the officers retreated from Plaintiff's apartment after she had threatened them with a knife upon their initial entry, they had confirmation that Plaintiff in fact had a deadly

weapon and appeared willing to use it. That is, Plaintiff's behavior toward the officers during their initial entry only confirmed that her condition had deteriorated to the point of creating an emergency. She was now out of sight behind closed doors, where additional weapons, including firearms, could have been present. It was objectively reasonable, therefore, for the officers to believe that Plaintiff was even *more* of a danger to herself and to others than they had assumed before the first entry. Here, as in *Michigan v. Tyler*, 436 U.S. 599, 511 (1978), and *Fisher v. City of San Jose*, 558 F.3d 1069, 1077 (9th Cir. 2009) (en banc), the passage of time was brief and the exigent circumstances that motivated the first entry "did not materially change from the beginning of the standoff to the end." Because the exigency persisted or worsened throughout, "the officers were not required to periodically reassess whether the exigency persisted throughout the standoff because the standoff was 'no more than an actual continuation' of the initial seizure." *Fisher*, 558 F.3d at 1077 (quoting *Tyler*, 436 U.S. at 511).

I would hold that reasonable officers could have concluded that they were entitled to continue the initial search and that determinedly pushing the door open with weapons readied was a reasonable amount of force when balanced against the need to resolve an ongoing emergency that involved a deadly weapon. *See Billington*, 292 F.3d at 1184 ("We analyze excessive force claims in the arrest context under the Fourth Amendment's reasonableness standard. We balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake' and ask whether, under the circumstances, 'including the severity of the crime at issue, the suspect poses an immediate threat to the safety of the officers or others . . .'" (quoting *Graham v.*

*Connor*, 490 U.S. 386, 395–96 (1989)).  In view of the extant legal principles, reasonable officers could conclude that their actions were permitted even though Plaintiff suffered from a mental illness.  Police officers often interact with individuals who have a wide variety of specific needs, and there is no controlling case law that requires a different Fourth Amendment analysis for an officer on the street who faces those circumstances.  *See Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001) ("We do not adopt a per se rule [for excessive force] establishing two different classifications of suspects:  mentally disabled persons and serious criminals.").  Moreover, we must "judge reasonableness 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight' and allow 'for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'"  *Billington*, 292 F.3d at 1184 (quoting *Graham*, 490 U.S. at 396).

C.  *Conclusion*

The district court properly granted summary judgment to Defendants on the Fourth Amendment excessive force claim concerning the second entry into Plaintiff's apartment. Defendants are entitled to qualified immunity.  I therefore respectfully dissent from the majority's contrary holding on that claim, but otherwise concur.