FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALISON MAYFIELD,

        *Plaintiff-Appellant*,

  v.

CITY OF MESA,

        *Defendant-Appellee*.

No. 23-3222

D.C. No. 2:22-cv-
02205-JAT

OPINION

Appeal from the United States District Court
for the District of Arizona
James A. Teilborg, District Judge, Presiding

Argued and Submitted September 10, 2024
Phoenix, Arizona

Filed March 24, 2025

Before: Johnnie B. Rawlinson and Daniel P. Collins,
Circuit Judges, and Sidney A. Fitzwater, District Judge.[*]

Opinion by Judge Collins

---

[*] The Honorable Sidney A. Fitzwater, United States District Judge for
the Northern District of Texas, sitting by designation.

# SUMMARY[**]

## Americans with Disabilities Act / Rehabilitation Act

The panel affirmed the district court's dismissal of an action brought by Alison Mayfield, who is deaf and communicates primarily through American Sign Language ("ASL"), alleging that she was denied a "reasonable accommodation" in violation of Title II of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA") when officers from the City of Mesa's Police Department ("MPD") failed to provide her with an ASL interpreter during a traffic stop and subsequent blood-drawing procedure at a DUI facility.

The panel held that plaintiff's ADA and RA claims were not barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), because a ruling in plaintiff's favor would not necessarily negate an element of the offense of which she was convicted—reckless driving—and would not otherwise imply the invalidity of her conviction or sentence. The district court erred in two respects in its application of the *Heck* bar. First, the district court erroneously considered whether plaintiff's claims, if successful, would undermine her original charges for DUI and not merely her ultimate conviction for reckless driving. Second, the district court erred in concluding that the City of Mesa had carried its burden to establish the applicability of the *Heck* bar in this case.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Turning to the merits, the panel held that the relevant question here was whether, in light of the exigent circumstances applicable in the context of the stop and arrest of a deaf motorist, the means of communication used were sufficient to allow the detained motorist to effectively exchange information with the officer so as to accomplish the various tasks entailed in the stop and arrest. Applying that standard, the panel held that plaintiff failed to plead sufficient facts to establish that MPD discriminated against her by failing to provide a reasonable accommodation during her arrest and blood testing. Because plaintiff would be unable to amend her complaint to overcome the indisputable evidence in the incorporated body camera footage, the district court properly dismissed her complaint without leave to amend.

## COUNSEL

David J. Hommel Jr. (argued) and Andrew Rozynski, Eisenberg & Baum LLP, New York, New York; William A. Richards, Richards & Moskowitz PLC, Phoenix, Arizona; for Plaintiff-Appellant.

Christina G. Retts (argued), Kathleen L. Wieneke, and Laura A. Van Buren, Wieneke Law Group, Tempe, Arizona, for Defendant-Appellee.

## OPINION

COLLINS, Circuit Judge:

This action under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and § 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, arises from the traffic stop and DUI arrest of Plaintiff Alison Mayfield on the late evening of January 1, 2022. Mayfield, who is deaf and communicates primarily through American Sign Language ("ASL"), asserts that she was denied a "reasonable accommodation" in violation of the ADA and the RA when officers from the Defendant City of Mesa's Police Department ("MPD") failed to provide her with an ASL interpreter during the traffic stop and a subsequent blood-drawing procedure at a DUI processing facility. The district court granted the City's motion to dismiss Mayfield's ADA and RA claims, and she appeals. We affirm.

### I

### A

"Because the district court resolved this case on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we must take as true the operative complaint's well-pleaded allegations, including any such allegations that rely on the incorporation of documents attached to the complaint, and we draw all reasonable inferences in favor" of Mayfield. *Shields v. Credit One Bank, N.A.*, 32 F.4th 1218, 1220 (9th Cir. 2022). Because Mayfield's complaint refers to, and quotes from, the footage from the body cameras worn by the MPD officers who stopped and arrested Mayfield, the district court correctly held that the body camera footage was incorporated by reference into the complaint. *See Orellana*

*v. Mayorkas*, 6 F.4th 1034, 1043 (9th Cir. 2021). And because Mayfield has never contended that the video footage is inaccurate or unreliable, we "view[ ] the facts in the light depicted by the videotape," *Scott v. Harris*, 550 U.S. 372, 380–81 (2007), although we construe any ambiguities in the video footage in "the light most favorable" to Mayfield, *see Orellana*, 6 F.4th at 1043. *See also Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021) (stating that, "where video recordings are included in the pleadings, as is the case here, the video depictions of events, viewed in the light most favorable to the plaintiff, should be adopted over the factual allegations in the complaint if the video 'blatantly contradict[s]' those allegations" (quoting *Scott*, 550 U.S. at 380) (alteration in original) (footnote omitted)). With these principles in mind, we take the following facts as true for purposes of this appeal.

On January 1, 2022, Alison Mayfield was driving home at around 9:45 PM, when MPD Officer M. Hall pulled Mayfield over after assertedly observing her "weaving" in traffic.[1] Mayfield is deaf and primarily communicates through ASL, and this fact shaped her ensuing contacts with Officer Hall and other officers. Although Mayfield is able to communicate verbally with a "quality assistive hearing device," the particular device Mayfield was wearing in her left ear at the time of the traffic stop was of poor quality. Due to that circumstance and to "the wind and other outside noises" during the stop, Mayfield was unable to hear any human speech during her interaction with the police.

---

[1] The footage does not clearly show Mayfield weaving, but Mayfield does not dispute "that she was driving recklessly." After she was stopped, Mayfield told Officer Hall that her car has "mechanical issues" that cause it to "pull[] to the left."

Mayfield, however, also has a "limited ability to read lips" and is able to read and write in English.

Given these circumstances, Mayfield and Officer Hall used a variety of different means to communicate throughout the traffic stop.  At some points, they each typed out messages on their cell phones and then showed those messages to one another.  On other occasions, Officer Hall spoke facing Mayfield, so that Mayfield could read her lips. Officer Hall also later retrieved a notepad from her vehicle, and she wrote out messages for Mayfield on the notepad. Although Mayfield alleges that she had trouble reading the various messages because she had been pulled over on a street with no nearby streetlights, Officer Hall repeatedly used her flashlight to help Mayfield read her typed and handwritten questions and instructions, and Mayfield also turned on the lights in her car on one occasion so that Officer Hall could read the response that Mayfield had typed on her phone.  At another point, Officer Hall tried to shape letters with her fingers, but without much apparent success, and she and Mayfield instead communicated by typing on their phones.  To more clearly set forth Officer Hall's and Mayfield's specific use of these various methods over the course of their interaction during the traffic stop, we will recount their encounter in more detail, proceeding chronologically.

When Officer Hall first came up to Mayfield's driver's side window, Mayfield "immediately began communicating" in ASL, including "request[ing] an ASL interpreter."  Mayfield also immediately made a gesture of writing on a surface, thereby signaling to Officer Hall that the officer could write out any communications.  Officer Hall did not know ASL, and upon realizing that Mayfield is deaf, she promptly walked back to her vehicle to retrieve her

phone. She then began typing out messages to Mayfield on her phone, albeit with some "typos," and she showed them to Mayfield, using her flashlight to help illuminate the area. In response to Officer Hall's messages, Mayfield was able to communicate to Officer Hall that she had used marijuana at around 8:00 AM that day.[2]

Officer Hall was able to communicate to Mayfield that she wanted her driver's license, and while Mayfield was looking for it, Officer Hall radioed for backup, specifically asking whether there was someone available who knew sign language. Officer Hall then returned to her patrol vehicle, where she checked Mayfield's driver's license and obtained a notepad, a pen, and a clipboard with forms. Before returning to Mayfield's car, Officer Hall wrote out certain instructions on the notepad, including "Can you exit the vehicle please?"; "We will stand on the sidewalk."; and "Can I pat you down for weapons?" When Officer Hall showed these instructions to Mayfield, she promptly got out of her car and moved to the sidewalk.

At around that time, MPD Officer Van Hilsen, who does not know ASL, arrived as backup. Mayfield was able to consent to a pat down search for weapons, and Officer Hall performed the search. Officer Hall then wrote out the following on a notepad: "I would like to do some testing to make sure you are safe to drive. Is that OK[?]" She showed Mayfield that note, illuminating it with her flashlight. Mayfield wrote a message on the note and handed it back to Officer Hall, who read it and said, "Okay." Although Officer Van Hilsen did not read Mayfield's note, he

---

[2] According to Mayfield, she legally uses marijuana "[t]o alleviate the symptoms associated with vertigo and debilitating migraines."

observed Mayfield's gestures and body language, and he said, "Bathroom."

Officer Hall proceeded to administer several different sobriety tests. The first test required Mayfield to follow a moving pen with her eyes, and Mayfield was able to follow Officer Hall's instructions, which were given orally and through gestures.

For the next test, which is sometimes referred to as a "Romberg" test,[3] Officer Hall showed Mayfield a set of pre-printed instructions on a form, pointing to the relevant language with her pen and underlining portions of it. Officer Van Hilsen used his flashlight to illuminate the instructions as Officer Hall went over them with Mayfield. Mayfield nodded after looking at the relevant text, although she alleges in her complaint that she understood the instructions "only partially." Officer Hall supplemented the written form with oral instructions, asking Mayfield to keep her feet together and her arms at her sides and to put her head back with her eyes closed. Mayfield followed those instructions and stayed in that position while Officer Hall timed her.

Before administering the third test, Officer Hall wrote a message on her notepad, and then Mayfield wrote her response on the same notepad. Officer Hall then explained the test, alternating between spoken explanations and pointing to pre-printed instructions. At one point, Mayfield held on with her left hand to the clipboard that contained the written instructions, and her right-hand finger traced along the relevant instructions as she read them. The test was a

---

[3] *See Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1077 (11th Cir. 2007) (stating that, in the "Romberg" test, "the individual must keep his feet together, hold his arms by his side, tilt his head back, close his eyes, and count silently for thirty seconds").

walk-and-turn test, requiring Mayfield to take nine steps in a line, turn, and then take nine steps back in a line. Officer Hall also demonstrated the test by performing three steps herself. After she did so, she asked Mayfield if she had any questions, and Mayfield shook her head no. Mayfield then performed the test.

The fourth and final test required Mayfield to stand on one leg. Officer Hall explained this test orally while pointing to the written instructions on the clipboard, which were illuminated by her flashlight. Officer Hall also demonstrated what she wanted Mayfield to do. After explaining this test, Officer Hall asked Mayfield if she understood, and Mayfield slightly nodded her head and gestured with her hand. Officer Hall then asked Mayfield if she had any questions, and Mayfield shook her head no. Mayfield then proceeded to perform this test.

Although Mayfield was able to complete the tests, she apparently did not pass them. According to Mayfield, her failed tests were not due to intoxication. Rather, as a result of her deafness, Mayfield suffers from vertigo, which she asserts makes it difficult for her to complete balancing tests. Further, she alleges, it was below 50 degrees outside, and she had a "dire need to use the restroom."

After the testing was completed, Mayfield was placed in handcuffs, with her hands in front of her rather than behind her. Officer Hall stated that she would get Mayfield to a restroom. Officer Hall told Mayfield that she would not be going to jail, that she would just be completing "paperwork" and would then go home. Mayfield was "transported . . . in the back of a patrol car to MPD's DUI processing facility." She was administered a written *Miranda* warning. At the DUI processing facility, Mayfield was able to use the

restroom. She "once again requested an [ASL] interpreter" but was "told that none was available." Another officer at the facility, MPD Officer Voeltz, attempted to have Mayfield communicate with him through a video call with his mother, who he said was a certified ASL translator, but the call was unsuccessful. Mayfield received a consent form for blood drawing, which she read and signed. Mayfield then cooperated with the person who drew her blood sample. Mayfield was given a second form to review, and after reading it, she signed the form.

Mayfield was subsequently charged with (1) "driving while under the influence of intoxicating liquor, drugs, vapor[-]releasing substance[s,] or any combination thereof," in violation of Arizona Revised Statutes § 28-1381(A)(1); and (2) "driving while there [wa]s any drug defined in [Arizona Revised Statutes] § 13-3401 or its metabolite in [her] body," in violation of Arizona Revised Statutes § 28-1381(A)(3). These charges were ultimately dropped when Mayfield instead pleaded guilty to a single count of reckless driving in violation of Arizona Revised Statutes § 28-693(A), which provides that "[a] person who drives a vehicle in reckless disregard for the safety of persons or property is guilty of reckless driving."

**B**

Mayfield sued the City of Mesa under Title II of the ADA and § 504 of the RA, alleging that the City's MPD officers had discriminated against her by failing to provide a reasonable accommodation for her disability—namely, either an in-person ASL interpreter or a Video Remote Interpreting service—after she was pulled over. The district court dismissed Mayfield's complaint with prejudice, holding alternatively that (1) Mayfield's claims were barred

pursuant to the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994); and (2) in any event, Mayfield had not plausibly alleged claims under the ADA or RA. This timely appeal followed. We have jurisdiction under 28 U.S.C. § 1291.

## II

We first address the district court's holding that Mayfield's ADA and RA claims are barred by *Heck*.

Under *Heck*, a plaintiff's civil claims challenging government conduct in connection with her arrest and prosecution may not proceed if a judgment in her favor "would necessarily imply the invalidity of [her] conviction or sentence." 512 U.S. at 487; *see Nelson v. Campbell*, 541 U.S. 637, 647 (2004) (noting that *Heck* was "careful . . . to stress the importance of the term 'necessarily'"). Although *Heck* itself concerned claims under 42 U.S.C. § 1983, we have held that *Heck*'s reasoning applies equally to claims under Title II of the ADA. *See Bogovich v. Sandoval*, 189 F.3d 999, 1002–03 (9th Cir. 1999) ("There is no reason to believe that ADA claims should be treated any differently than § 1983 claims when examining whether a prisoner's case should have been brought under habeas corpus."). Mayfield contends that *Heck* is inapplicable to her particular claims, because a ruling in her favor here would not necessarily negate an element of the offense of which she was convicted and would not otherwise imply the invalidity of her conviction or sentence. Reviewing the district court's application of *Heck* de novo, *see Hebrard v. Nofziger*, 90 F.4th 1000, 1006 (9th Cir. 2024), we agree.

To evaluate "whether success on" an ADA claim "would *necessarily* imply the invalidity of a conviction, we must determine which acts formed the basis for the conviction."

*Lemos v. County of Sonoma*, 40 F.4th 1002, 1006 (9th Cir. 2022) (en banc).  When, as here, "the conviction is based on a guilty plea, we look at the record to see which acts formed the basis for the plea."  *Id*.  If the plaintiff's success on her claim would "'negat[e] an element of the offense' of which she was convicted," *id.* at 1007 (quoting *Heck*, 512 U.S. at 486 n.6), then *Heck* bars that claim.  Under our precedent, however, *Heck* does not apply when (1) the plaintiff committed *multiple* distinct acts that were each "sufficient to warrant the filing of a criminal charge"; (2) the plaintiff is challenging police conduct with respect to only one or some of those acts; and (3) "the record does not reflect which acts underlay [the plaintiff's] plea."  *Smith v. City of Hemet*, 394 F.3d 689, 696–97 (9th Cir. 2005) (en banc), *disapproved on other grounds by Lemos*, 40 F.4th at 1008–09; *see also Byrd v. Phoenix Police Dep't*, 885 F.3d 639, 644–45 (9th Cir. 2018).  Put differently, when the plaintiff's conviction *could* be based on activity or evidence untainted by purportedly unlawful police conduct, then her claims are not "*necessarily* inconsistent with [her] conviction," and the *Heck* bar does not apply.  *Smith*, 394 F.3d at 696.

Applying these principles, we conclude that the district court erred in two respects in its application of the *Heck* bar here.  First, the district court erroneously considered whether Mayfield's claims, if successful, would undermine her original *charges* for DUI and not merely her ultimate conviction for reckless driving.  But as we reiterated in *Lemos*, *Heck* only bars claims that "would necessarily imply the invalidity of a *conviction*," 40 F.4th at 1006 (emphasis added) (original emphasis omitted), and here, Mayfield pleaded guilty to, and was only convicted of, reckless driving in violation of Arizona Revised Statutes § 28-693(A).  Indeed, once Mayfield accepted her plea agreement

and entered her guilty plea, there were no longer any pending DUI charges against her, because the plea agreement explicitly "amend[ed] the [criminal] complaint to charge the offense to which [Mayfield] plead[ed]." The *Heck* inquiry in this case must therefore be focused only on the specific offense of which Mayfield was ultimately *convicted*. A civil claim that would only undermine a charged offense that was later dropped is not sufficient to trigger the *Heck* bar.

Second, the district court erred in concluding that the City had carried its burden to establish the applicability of the *Heck* bar in this case. *See Washington v. Los Angeles Cnty. Sheriff's Dep't*, 833 F.3d 1048, 1056 n.5 (9th Cir. 2016) (holding that the defendant asserting the *Heck* bar has the burden to "show that the plaintiff's success in the action would necessarily imply the invalidity of a criminal conviction"). The judicially noticed records from Mayfield's criminal case that were submitted in support of the City's motion to dismiss do not contain any recitation of the factual basis for Mayfield's plea, but instead merely state that "[a] basis in fact exists for believing the defendant guilty of the offense[] charged." As a result, the district court erred in concluding that the City had shown that Mayfield's conviction *necessarily* rested on the *evidence obtained during and after the traffic stop*, such that success in Mayfield's suit would call into question the legality of the collection of that evidence and her ensuing conviction. Nothing in the factual record or in the relevant Arizona law precludes the equally plausible view that Mayfield's plea and conviction could have sufficiently rested solely on Officer Hall's observation of Mayfield's vehicle weaving on the road *prior* to the challenged traffic stop. Visibly weaving in traffic may qualify as driving "in reckless disregard for the safety of persons or property," ARIZ. REV. STAT. § 28-

693(A), and testimony from Officer Hall concerning Mayfield's weaving would be amply sufficient to establish that offense in a way that is completely independent of the merits of this civil suit.  Because the record thus does not suffice to establish which of Mayfield's "temporally [and] spatially" "distinct" acts—*viz.*, her weaving while driving or her asserted intoxication—underlies her plea and conviction, a ruling in her favor would not necessarily "demonstrate the invalidity of" her conviction.  *Beets v. County of Los Angeles*, 669 F.3d 1038, 1042 (9th Cir. 2012) (quoting *Heck*, 512 U.S. at 486–87), *disapproved on other grounds by Lemos*, 40 F.4th at 1009.  *Heck* therefore does not bar Mayfield's ADA and RA claims.

## III

We proceed to consider the merits of Mayfield's claims, reviewing the district court's dismissal de novo.  *See Martell v. Cole*, 115 F.4th 1233, 1235 (9th Cir. 2024).

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Section 504 of the RA similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  Title II of the ADA and § 504 of the RA are "interpreted coextensively because there is no significant difference in the analysis of rights and obligations created by" each provision.  *Payan v. Los Angeles Cmty. Coll. Dist.*,

11 F.4th 729, 737 (9th Cir. 2021) (simplified).  Accordingly, we will limit our discussion to the ADA claim, but with the understanding that the following analysis will equally apply to the RA claim.

Under Ninth Circuit precedent, a Title II claim may arise where police "fail to reasonably accommodate the [plaintiff's] disability in the course of investigation or arrest, causing the [plaintiff] to suffer greater injury or indignity in that process than other arrestees."  *Sheehan v. City & County of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part on other grounds*, 575 U.S. 600 (2015).[4]  "To prove that a public program or service violated Title II of the ADA, [a plaintiff] must show that: (1) [she] is a qualified individual with a disability; (2) [she] was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of [her] disability."  *Updike v. Multnomah County*, 870 F.3d 939, 949 (9th Cir. 2017) (simplified).

There is no dispute that Title II applies to the City of Mesa.  Likewise, the parties do not dispute that Mayfield has sufficiently alleged that, under Title II, she is a qualified individual with a disability and that, if she establishes actionable    discrimination    under    prong    (2),    such

---

[4] In *Sheehan*, the Supreme Court granted a writ of certiorari in part to determine whether Title II of the ADA applies to arrests, but it ultimately determined that the writ had been improvidently granted as to that question, and so it did not decide that issue one way or the other. 575 U.S. at 610.  Consequently, this court's holding that "Title II applies to arrests," *Sheehan*, 743 F.3d at 1232, remains the binding law of this circuit.  *See Vos v. City of Newport Beach*, 892 F.3d 1024, 1036–37 (9th Cir. 2018).

discrimination would be "by reason" of her disability.  The key issue, then, is whether Mayfield has sufficiently alleged that MPD discriminated against her in violation of Title II.

Here, Mayfield's theory is that MPD officers discriminated against her by failing to communicate with her in a manner that *reasonably accommodated* her deafness, thereby depriving her of the ability to fully participate in the officers' questioning and testing.  *See Sheehan*, 743 F.3d at 1233 (holding that "failure to provide a reasonable accommodation" in the course of an investigation or arrest may constitute unlawful discrimination under Title II); *see also Updike*, 870 F.3d at 951 ("The failure to provide reasonable accommodation can constitute discrimination." (simplified)).    A plaintiff asserting a reasonable-accommodation claim under Title II "bears the initial burden of producing evidence of the existence of a reasonable accommodation," *Sheehan*, 743 F.3d at 1233, that was "denied or . . . not provided," *Updike*, 870 F.3d at 951.  If the plaintiff carries this burden, the defendant may nonetheless defeat the claim by showing that the plaintiff's proposed accommodation would cause an "undue burden." *Id*. at 950.

"[T]he reasonableness of an accommodation is ordinarily a question of fact."  *Sheehan*, 743 F.3d at 1233. In assessing whether there has been a violation of the obligation to provide reasonable accommodations to a *deaf* individual, we have held that there is no per se obligation to provide "an on-site interpreter every time" one is requested; "[r]ather, the test is whether an individual has received an auxiliary aid sufficient to prevent any 'real hindrance' in her ability to exchange information." *Bax v. Doctors Med. Ctr. of Modesto, Inc.*, 52 F.4th 858, 867 (9th Cir. 2022) (citation omitted).  "Assessing whether an entity provided appropriate

auxiliary aids where necessary to afford effective communication is a fact-intensive exercise. The trier of fact must weigh several factors, including the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." *Id*. (simplified).

Moreover, in the specific context of *arrests*, the court must also consider whether any "exigent circumstances" surrounding the plaintiff's encounter with law enforcement would render a proposed reasonable accommodation impracticable. *Sheehan*, 743 F.3d at 1232 ("[E]xigent circumstances inform the reasonableness analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment."). As the *Sheehan* Court explained, "[e]xigent circumstances include those circumstances that would cause a reasonable person to believe that [police conduct] was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Id.* at 1221 (simplified).

Taking these various propositions together, we conclude that the relevant question here is whether, in light of the exigent circumstances applicable in the context of the stop and arrest of a deaf motorist, the means of communication used were sufficient to allow the detained motorist to effectively exchange information with the officer so as to accomplish the various tasks entailed in the stop and arrest. Applying that standard, we hold that Mayfield has failed to plead sufficient facts to establish that MPD "discriminated against [her] by failing to provide a reasonable accommodation during" her arrest and blood testing.

*Sheehan*, 743 F.3d at 1233; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678–80 (2009).

With respect to the questioning and sobriety testing preceding Mayfield's arrest, the body camera footage establishes that, even if Mayfield's understanding of Officer Hall's instructions was only partial, it was nonetheless sufficient to enable her to provide the information being requested and then to complete the various field sobriety tests she was asked to perform. As our above summary makes clear, Officer Hall's body camera footage shows that Mayfield and Officer Hall were able to effectively communicate with one another in all *material* respects throughout the encounter, thereby confirming that there was no "'real hindrance' in [Mayfield's] ability to exchange information." *Bax*, 52 F.4th at 867. Officer Hall was able to communicate the purpose of the stop, and Mayfield responded by informing Officer Hall that she had consumed marijuana more than 12 hours before driving. Mayfield was able to produce her license upon request, and she was able to read and follow Officer Hall's handwritten instructions asking her to exit her vehicle and stand on the sidewalk. She was then able to read handwritten notes advising her that she would be subjected to a pat down and to sobriety tests, and she was able to communicate to the two officers then on the scene that she needed to use the bathroom. The video footage further confirms that, thereafter, by the use of a combination of written instructions, lip-reading, and/or visual demonstration by Officer Hall, Mayfield was able to understand the instructions for each of the four sobriety tests and that Mayfield did in fact attempt to perform the specific tasks required in each of those four tests.

Likewise, at the DUI processing facility, Mayfield was able to effectively communicate in all respects that were

material to the accomplishment of the relevant tasks. In particular, Mayfield was presented with physical copies of the pertinent consent documents, and she attested, with her signature, that she had read and understood them. Although Officer Voeltz's attempts to communicate with her were less successful, there are no allegations sufficient to support a plausible inference that any *material* aspect of the DUI processing was ultimately hindered.

Moreover, as other courts have recognized, traffic stops—particularly for suspected DUI offenses—present "exigent circumstances" that limit the range of what would constitute a "*reasonable* modification of police procedures." *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1086 (11th Cir. 2007) (emphasis added); *see also Bahl v. County of Ramsey*, 695 F.3d 778, 785–86 (8th Cir. 2012) (expressly agreeing with *Bircoll* on this point). In particular, the safety concerns presented by a roadside traffic stop, the need to make a prompt judgment as to a motorist's ability to drive, and the interest in potentially collecting accurate test results measuring intoxication before such evidence dissipates all warrant acting without unnecessary delay. As the Eleventh Circuit explained in rejecting a comparable claim for a roadside interpreter during a 3:00 AM DUI traffic stop of a deaf motorist:

> [W]e conclude that waiting for an oral interpreter before taking field sobriety tests is not a reasonable modification of police procedures given the exigent circumstances of a DUI stop on the side of a highway, the on-the-spot judgment required of police, and the serious public safety concerns in DUI criminal activity. In DUI stops, as opposed

to minor traffic offenses, the danger to human life is high.  To protect public safety, [the officer] had to determine quickly, on the roadside at 3:00 a.m., whether [the motorist] was sober enough to drive his car further or whether to impound his car and arrest him. DUI stops involve a situation where time is of the essence.  Forestalling all police activity at a roadside DUI stop until an oral interpreter arrives is not only impractical but also would jeopardize the police's ability to act in time to obtain an accurate measure of the driver's inebriation.     Moreover,   field   sobriety exercises are short tests that can be physically and visually demonstrated.  DUI stops do not involve  lengthy  communications  and  the suspect  is  not  asked  to  give  a  written statement.  In sum, field sobriety tests in DUI arrests  involve  exigencies  that  necessitate prompt action for the protection of the public and make the provision of an oral interpreter to a driver who speaks English and can read lips per se not reasonable.

*Bircoll*, 480 F.3d at 1086; *see also Rosen v. Montgomery County*, 121 F.3d 154, 158 (4th Cir. 1997) ("The police do not have to get an interpreter before they can stop and shackle a fleeing bank robber, and they do not have to do so to stop a suspected drunk driver, conduct a field sobriety test, and make an arrest.").

Although the traffic stop here did not occur quite as late as the one in *Bircoll*, that is not a meaningful distinction in the context of this case.  Officer Hall's stop of Mayfield

occurred on the side of the road late in the evening on a holiday, after Officer Hall had assertedly observed Mayfield "weaving" as she drove. Officer Hall thus reasonably suspected that Mayfield might be under the influence of an intoxicant, and delay in conducting sobriety tests could have "jeopardize[d]" Officer Hall's "ability to act in time to obtain an accurate measure of" Mayfield's potential inebriation and to protect the public. *Bircoll*, 480 F.3d at 1086. Moreover, Officer Hall explicitly *did* request a "'sign language' officer" very early in the encounter with Mayfield, but no such officer was available at the time of the DUI stop, nor was one available later when Hall was booked at the DUI processing facility. And even though "the exigencies of the situation were greatly reduced" by the time Mayfield was at the DUI processing facility, they were not eliminated, and the video footage of the events at that facility, as well as the consent forms—all of which are properly deemed to be incorporated into Mayfield's complaint—confirm that "effective communication" was achieved for purposes of the relevant task to be accomplished, which was drawing a sample of Mayfield's blood for testing. *See Bircoll*, 480 F.3d at 1087; *see also id*. at 1086–87 (stating that the key question is "[w]hat steps are reasonably necessary to establish effective communication with a hearing-impaired person after a DUI arrest and at a police station" and that effective communication was established where the officer "gave physical demonstrations" of the field sobriety exercises "[i]n addition to verbal instructions," and the motorist admitted that he "understood that he was being asked to perform field sobriety tests" and that "he actually tried to perform at least three of those tests").

Given the exigent circumstances inherent in the traffic stop and subsequent drawing of blood, and the overall

adequacy of the communications between the officers and Mayfield with respect to the relevant tasks, Mayfield is wrong in contending that the obligation to provide reasonable accommodations required Officer Hall to obtain an interpreter, either "on-site or through video remote interpreting . . . services."  The MPD therefore did not violate Title II of the ADA or § 504 of the RA, and Mayfield's complaint was properly dismissed for failure to state a claim.  *See Bircoll*, 480 F.3d at 1086–87 (rejecting Title II claim where "the actual communication between [the highway officer] and [the motorist] was not so ineffective that an oral interpreter was necessary to guarantee that [the motorist] was on equal footing with hearing individuals"); *see also Rosen*, 121 F.3d at 158 (holding that, because the deaf motorist "adequately participated in the various tests for intoxication, and the officers obtained the information they needed to complete the booking process," the motorist "was simply not 'discriminated against' just because he could not follow everything the officers were telling him").[5]  And

---

[5] Mayfield cites a "Best Practices Toolkit" that was issued by the U.S. Department of Justice in 2007, and she contends that (1) this document has the force of a binding regulation; and (2) this document "*require[s]*" the use of "advanced aids," such as an interpreter, for any communications with a deaf person beyond "brief or simple face-to-face exchanges."  *See* ADA Best Practices Tool Kit for State and Local Governments ("Toolkit") § 3(B)(1), https://archive.ada.gov/pcatoolkit/ch3_toolkit.pdf.  Mayfield is wrong on both counts.  The regulations authorized by Title II of the ADA, *see* 42 U.S.C. § 12134, are contained in Part 35 of Chapter I of Title 28 of the Code of Federal Regulations, and not in this Toolkit document.  Indeed, the governmental website that Mayfield cites and that contains the Toolkit explicitly states that it is merely a "guidance document," that it "has no legally binding effect," and that "state and local governments are not required to use" it.  *See* Toolkit,

because, as the district court correctly observed, Mayfield would be "unable to amend her complaint to overcome the indisputable evidence in the incorporated body camera footage," the court properly dismissed the complaint without leave to amend.  *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (holding that leave to amend is properly denied when amendment would be futile).  We therefore affirm the district court's judgment dismissing this action with prejudice.

**AFFIRMED.**

---

https://archive.ada.gov/pcatoolkit/toolkitmain.htm.  In any event, as we expressly recognized in *Bax*, neither the applicable regulations nor the Toolkit establish the sort of inflexible rule Mayfield advocates.  *See Bax*, 52 F.4th at 870 ("We do not apply categorical rules to determine which auxiliary aids are required to achieve effective communication."); *see also id*. at 869–70 n.7 (holding that the Toolkit "contains no categorical prescription as to the appropriate 'aids and services' that are required for any particular context" (citation omitted)).